163 A.2d 493 (1960)
Jan A. BATA, Defendant Below, Appellant,
v.
Thomas J. BATA, Thomas J. Bata and David Graham, as Executors of the Estate of Mary T. Bata, and Western Investment and Trading Company, Limited, a Bermuda corporation, Plaintiffs Below, Appellees.
Supreme Court of Delaware.
August 3, 1960.
George T. Coulson (of Morris, Nichols, Arsht & Tunnell), Wilmington, and Henry Cohen and Daniel M. Sandomire (of Cohen & Sandomire), New York City, for appellant.
Robert H. Richards, Jr. (of Richards, Layton & Finger), Wilmington, and Inzer B. Wyatt, John W. Dickey and Edward C. Stebbins, Jr. (of Sullivan & Cromwell), New York City, for appellees.
SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.
*495 SOUTHERLAND, Chief Justice.
This case presents the latest phase of a long and bitter family struggle for the control of the immense Bata shoe business, a world-wide industrial enterprise founded by the late Thomas Bata of Czechoslovakia. That control is represented by the majority of the shares of stock of Leader, A. G., a Swiss corporation. Bearer certificates for 1,170 of the 2,000 issued shares of Leader are physically in the custody of the Court of Chancery. These shares are owned by two Delaware holding companies, Westhold Corporation and North River Securities Corporation, the shares of which are also in that court's custody.
It is admitted that all of the Leader shares were the property of Thomas Bata at the time of his death in 1932. The present claimants to the property in suit are (1) Thomas Bata's son, Thomas J. Bata, and the estate of Thomas Bata's widow, Marie T. Bata, on the one hand; and (2) Jan Bata, half-brother of Thomas Bata, on the other.
For convenience Thomas Bata, Sr. will be often referred to in this opinion as "Thomas"; his son and widow as "Tom" and "Marie", or as "plaintiffs"; and Jan Bata as "Jan" or "defendant".
Litigation growing out of the dispute has been going on for thirteen years. Certain aspects of the case have been decided by the courts of the State of New York, the courts of the Netherlands, and the courts of Switzerland.
The Delaware litigation was brought by Tom and his mother's estate in March 1954, against Jan. There are other parties to the suit, both plaintiffs and defendants, but for our present purpose their status in the litigation is unimportant.
After a trial of 100 days, the Chancellor on February 14, 1958, filed an opinion awarding the disputed shares to plaintiffs. Bata v. Hill, Del.Ch., 139 A.2d 159. After further hearings with respect to claims and the form of the decree, final judgment was entered on September 26, 1958. Jan appeals.
Background of the case prior to 1930.
Before dealing with the legal issues before us, we must sketch the factual background of the case.
Thomas Bata was born in 1876 in Moravia, then part of the Austro-Hungarian Empire, later a part of the Republic of Czechoslovakia. The Bata family had been shoemakers for generations.
In 1894 Thomas and a brother and a sister formed a partnership to engage in the shoe business at Zlin, in Moravia. After 1908 Thomas was the sole proprietor. The business thrived. By the time of the First World War it had become the largest producer of canvas shoes in the Empire. During the war the business continued to expand throughout the Empire, so that after the war Thomas had branches of the business in nearly all of the countries that came into being after the dissolution of the Empire. He also opened retail stores in Poland, Roumania, and other countries. These enterprises he carried on in the names of various relatives or associates  a forecast of the secrecy that, to some extent, was to characterize all his foreign operations.
Early in the 1920's Thomas continued to expand in foreign countries and began the practice of incorporating the newly established branches. His consistent method was to place a majority of the shares of each company (about sixty per cent) in his wholly-owned Dutch Company, "Bata Best". Some of the minority shares were registered in his name; others were bearer shares. His holdings of the minority shares, whether registered or bearer, were reported to the Czech authorities.
The profits of these foreign companies were accumulated as bank balances kept in the foreign countries. These profits were kept secret, and were recorded only in private records kept in Zlin (first by Thomas *496 as himself and later by Cipera), and called the "Export Department" of the Lynn, Massachusetts corporation, although they had nothing to do with the Lynn company.
By 1931, one year before his death, the value of the business was between $30,000,000 and $45,000,000.
During these years of growth, and also until he died, Thomas Bata was the absolute owner of the entire enterprise and was its dominating force. He was ahead of his time in his concept of the social responsibility of the owner of great wealth. He built homes for his fellow workers, as well as hospitals and theatres. He maintained a profit-sharing system. Perhaps he may be described as a benevolent dictator. He was called "The Chief"; all others were "fellow workers", and there were no titles. His word was law in the organization and at home.
His chief lieutenant was Dominick Cipera. Cipera was related to Thomas by marriage, had been with him since 1919, and held his power of attorney. Close to Thomas also were his half-brother Jan (one of the claimants here) and Muska, his confidential associate in financial matters. Although Jan was his half-brother by his father's second wife, there was a substantial difference in age, and it seems probable that Thomas treated Jan more as a younger son than as a contemporary. In 1909 Jan went to live with Thomas, and remained with him for ten years. He became one of Thomas' trusted lieutenants.
Thomas had married in 1912. His home life was entirely happy and he was apparently devoted to his wife. She was a charming and attractive woman, but with no knowledge of or interest in business. Tom was their only child. Thomas took great interest in his son's development, supervised his education, and, as the Chancellor found, was evidently "grooming" him for an important place in the business.

The formation of Leader.
It is evident that by 1930 Thomas had decided to effect a reorganization of his far-flung industrial empire. But he faced a serious problem.
The large profits of the export business have been referred to. The foreign balances ultimately totaled more than $7,000,000. These profits were never remitted to the Czech company, and were not even carried on the books of any of the foreign companies. The only record of them was kept in Zlin. No taxes had ever been paid on them. This method of handling the money was in violation of the Czech laws relating to the repatriation of foreign balances, and, of course, in violation of the revenue laws.
Accordingly, in establishing a holding corporation for the great Bata enterprise secrecy was required. The solution was found in the creation of Leader, a Swiss corporation. It is reasonably apparent, as the Chancellor said, that Thomas sought the "financial asylum" of neutral Switzerland in the "political and economic turmoil" of the time; and that in so doing he was motivated both by a desire to conceal his assets and by an intent to evade taxation. Accordingly, on the advice of Swiss counsel, Dr. Wettstein of Zurich, Leader was formed, with a capital stock of 2,000 bearer shares.
A majority of the shares of each of the Bata companies outside of Czechoslovakia was transferred to it, as well as the foreign bank balances. An arrangement was devised to prevent the disclosure of the transactions. All of the Leader shares (except for four qualifying shares) were delivered to Thomas. He acknowledged receipt of 890 shares for the account of Bata Best, and of the remaining shares for his own account. An elaborate scheme, involving pledges of the shares, was adopted to conceal Thomas' ownership. The Swiss lawyers, appearing to be the stockholders, acted as "mandatories" for Thomas, *497 i. e., were bound to follow his directions with respect to the shares. Although Bata Best entered its holdings of these shares on its books, the certificates were actually deposited in a Zurich bank in the custody of Muska.
But the creation of Leader was only a partial solution. What would happen upon Thomas' death? His estate would be confronted with the same problems  not only disclosure of the foreign assets, but also crippling inheritance taxes. There is evidence that he was much concerned about such taxes. The rate applicable to an estate inherited by his wife and son would be 26%; the rate on property left to a brother would be 38%. On the other hand, a tax on a written contract of sale during lifetime would be only 2%. (An oral contract was exempt from tax.)
In the light of these circumstances Thomas determined upon a very unusual course, as will shortly appear.

Death of Thomas Bata; the memorandum of sale and the will.
Thomas Bata died in an airplane crash on July 12, 1932, at the age of 56. He was in good health and expected to continue in his business. Tom was 17 years old and was working for Bata in Switzerland. Jan was about 34 years of age. He had been in the business for a number of years and had become one of Thomas' trusted associates, though probably not so important a lieutenant as Cipera.
When Thomas Bata died the only key to his office safe was on his person. Cipera obtained it from the hospital and in the afternoon of July 12 the safe was opened by him. There were also present, Jan, Dr. Foerster, the Notary, and others (not including Mary).
There were found in the safe two sealed envelopes. The first was addressed to Jan. It was opened and found to be a memorandum dated May 10, 1931, purporting to evidence a sale to Jan Bata of all of Thomas' property, except certain real estate, for 50 million crowns (about $1,500,000 in United States money), to be paid within one year.
It consisted of two pages and was entirely in Thomas' handwriting. Some of those present read it and signed their names. Cipera endorsed it: "In our presence on 7/12, 32 opened by Jan A. Bata". According to one of those present Jan expressed great surprise. At the suggestion of Dr. Foerster, Jan wrote on the document: "I agree and purchase, Jan A. Bata". On the next day Jan added the words: "That is to say, I agreed and purchased as per oral agreement".
A second sealed envelope was found in the safe, endorsed in Thomas' handwriting: "My last will". It was delivered to the Notary, and was officially opened and read the next day. It was dated May 19, 1931. It consisted of two pages, entirely in Thomas' handwriting. It recited that his estate consisted of a claim against Jan Bata amounting to 50,000,000 crowns, and left various legacies to his widow, his son, and others.
There was also found in the safe a document setting forth Thomas Bata's philosophy with respect to the responsibilities of the owner of a great industrial enterprise. This was his "Moral Testament". It will be discussed later.
It was established in the New York litigation, and is admitted here, that the purported sale by Thomas to Jan in Thomas' lifetime was a fiction. It was evidently devised by Thomas, as indicated above, for the dual purpose of concealment and tax evasion. The legal effect of these two papers is the question at the heart of this controversy, and will be considered later. At the moment we set forth the steps taken by the heirs and Jan in the settlement of the estate. As will appear, these steps were such as to carry out Thomas' scheme for concealment and tax evasion.

*498 Czech Probate Procedure.
Probate proceedings under Czech law are quite different from ours. There is no executor or administrator. A "will" is an instrument disposing of all the estate or of a fractional part of all the estate. A "codicil" bequeaths legacies, but does not name heirs. The instrument left by Thomas Bata was therefore a codicil. Nevertheless, we shall for convenience refer to it as "the will".
If the testator leaves only a codicil, his heirs succeed to his entire estate as "universal successors", and are responsible for the payment of legacies.
After the death of a decedent there is a period of suspense in the settlement of the estate until the heirs come forward in the appropriate court and make a declaration of heirship. Once this is done, the probate court then determines, upon considering the testamentary documents, whether or not the declarants are truly the heirs of the decedent. If the document bequeaths only legacies then the determination by the court is that the declaring heirs are intestate heirs.
Once the heirs have been established, they have an option to proceed in either of two ways. They may take the decedent's estate with benefit of inventory, which means that the assets of the estate are appraised and listed, and thereafter the heirs are liable to the decedent's creditors only to the extent of the appraised estate.
The second alternative is for the heirs to accept the decedent's estate unconditionally. This means that the heirs succeed to all of the property of the decedent of whatsoever kind, conditioned upon their obligation to pay and discharge all debts and legacies. The heirs file an unsworn statement of assets, called a "statement in lieu of oath".
It is highly significant that if the heirs accept an estate unconditionally, the probate court does not inquire into the extent of the estate by means of an inventory. If they accept the estate conditionally, then a valuation of the estate is required under Czech probate practice.
If one or more of the heirs is a minor at the time the declaration of heirship is made, then the probate court will not permit an unconditional acceptance of the estate in behalf of the minor but will insist upon an inventory and valuation of the estate. The reason for this is obvious, i. e., the court will not permit a minor to be saddled with excess debts over the property he is to receive.
One further feature of Czech probate law should be noted. A decedent may not disinherit his children. This means, in the case of Thomas Bata, that his son, Tom, was entitled to 3/8 of the value of the entire estate.
Upon completion of these proceedings, the estate is delivered to the heirs by deed of delivery signed by the court. This deed under Czech law has the effect of vesting in the heirs title to all the estate, whether or not mentioned in the deed.

Settlement of the estate.
The heirs and Jan proceeded with the settlement of the estate and the payment of taxes. On July 18, 1932 Jan sent to the taxing authorities a copy of the sale memorandum of May 10, 1931, asserting no tax was due because he had bought the property by oral contract in Thomas' lifetime. The taxing authorities naturally refused to accept this contention, and considerable negotiation followed. Finally, the tax liability was compromised about a year later by assessing a 2% tax on the value of the property pretended to have been sold to Jan. That value was fixed at 274,540,264 crowns  about $8,200,000 in our money.
In September 1932, steps were taken looking to the filing of the declaration of heirship. By appropriate court action under Czech law, Tom was declared of age on September 21, 1932, shortly after he became eighteen. This was done, the Chancellor found (and we think correctly), primarily *499 to enable Tom and his mother to accept the estate unconditionally and thus avoid the court inventory of the estate. Such an inventory would have disclosed the gross under-valuation of the property listed on the sale memorandum and might well have led to the disclosure of the Leader holdings and a tax so large as to cripple the Bata enterprise.
The tax settlement was reached some time in the late spring or summer of 1933. On June 8, 1933, the declaration of heirship was filed, accepting the estate unconditionally, and on the same day was approved by the court.
On June 23 the required "statement in lieu of oath" was filed. This statement described the principal item of the estate as a "claim upon the firm of Bata a.s. in Zlin in the amount of Kc. 57,262,131". The language of the declaration recited that Jan "had settled this amount with the firm Bata * * * to the benefit of the testator * * *".
In effect, what was done was to charge Bata a.s. with Jan's supposed debt to Thomas, and also with the approximate amount of the other assets listed in the will. This was done "as of May 10, 1932" by a debit entry in Jan's account with Bata a.s. This was obviously done to make it appear that a sale had been completed before the death of Thomas.
In accordance with the sale memorandum, the minority shares of most of the foreign operating companies that stood in Thomas' name were transferred by Tom and Marie to Jan. Jan appears to have taken possession without objection of the minority bearer shares, or at least some of them. The majority shares were, as above noted, held by Leader. Jan took control of Bata a.s. No certificates of this company had ever been issued, and none were issued until some years later.
All dividends declared in respect of the minority shares were credited to Jan's account with Bata a.s.
Finally, Jan succeeded to Thomas' position of control with respect to the Swiss mandatories  the apparent holders of the Leader stock. No steps were ever taken, however, to transfer the ownership of any of the Leader shares to Jan.
The foregoing steps relate to the supposed inter vivos sale. The provisions of the will also had to be carried out.
The will purported to dispose of an estate of about 57 million crowns, consisting largely of Jan's supposed debt, thereafter assumed by Bata a. s., as above noted.
The deed of delivery of June 28, 1933, reciting the debt as settled with Bata a. s., stated that the property of Thomas Bata appeared as a claim against the firm. The deed specified the distribution of the estate according to the terms of the will. The deed also provided for the payment of any debts of the estate by Tom and Marie, and for the payment of estate duties by the heirs and legatees.
The actual distribution of the estate by the parties did not follow the will in several respects.
First, there was a substantial debt owing by Thomas to Bata a.s., at the time of his death. At the end of 1932 it was about 27 million crowns. Tom and Marie were legally obligated to pay it, but payment would have wiped out their cash legacies. The amount of the debt was charged to Jan's account on Bata a. s., and Thomas' account was credited with payment.
Second, certain of the real estate devised to Marie was not in the name of Thomas, but in Bata a.s. These properties were nevertheless transferred to her, together with the Zlin dwelling house, which was not devised to her in the will.
Third, inheritance taxes were legally payable by Tom and Marie. There were set up on the books of Bata a.s. accounts crediting Tom and Marie with the amounts of the cash legacies (and in Marie's case with the value of the real estate transferred *500 by Bata a.s.). Against these accounts inheritance taxes were charged, but offsetting credits for the benefit of Tom and Marie were set up on the books of Leader.
Fourth, although on the face of the will the sole cash provision for the widow was the legacy of 5 million crowns, many of her living expenses during the succeeding years were charged to Bata a. s., as had been the practice in Thomas' lifetime.
It is clear from these facts that after Thomas' death all parties in interest cooperated to carry into effect the scheme of secrecy and tax evasion devised by Thomas  as, indeed, it was to their interest to do.

Jan's control.
After Thomas' death Jan became the active manager of the enterprise  the "Chief", as Thomas Bata had been. Cipera and Muska continued to be the chief assistants. Tom's education was completed in 1933, and he entered upon a career of training in the business.
Thus, Thomas Bata's scheme was carried into effect.
For several years all appears to have gone well. The enterprise continued, as before, as a family concern. The Chancellor found that during these years the parties were indifferent to the questions of legal ownership, and the evidence, we think, justifies that finding. But it is not surprising that the artificiality of the transaction and the deception that had been practiced led ultimately to conflicting claims of ownership. In 1939 there was a quarrel between Jan and Tom. Tom was discharged. He apologized and was reinstated. Much is made of this, but its chief significance to us seems to lie in the fact that it was merely an incident that led to the inevitable.
The war years furnished the immediate occasion. In 1939, Jan, Tom and Marie went to the Americas. In 1941 Jan went to Brazil. After the outbreak of the Second World War, the German occupation of Czechoslovakia resulted in inquiries from the British authorities into the ownership of the Bata enterprise. These inquiries were not satisfactorily answered, and Jan was put on the British and American black lists. Despite the urgent pleading of Muska, Jan (then in South America) stubbornly refused all pertinent information, insisting that the ultimate ownership of Bata lay with a Swiss "consortium", and that no disclosure should be made of the real ownership of the Leader shares, which represented ownership and control. The result was, as the Chancellor found, that Tom, then in Canada, succeeded to control of the business almost by default.

Litigation.
Finally in 1947, after the war, Tom and his mother filed a suit in Switzerland to test the right of Jan to give instructions to the Swiss mandatories.
In the meantime, in 1942, Muska had died in New York. Bearer certificates representing 826 shares of Leader were found in his safe deposit box in that city. How they came to be there is an involved story that does not concern us. In May 1947, Tom and Marie filed suit in New York to recover them.
A third suit was filed by Tom and Marie in the courts of the Netherlands in 1949.
The results of these lawsuits, and their bearing on the controversy before us, will now be considered.

The Prior Judgments.
As might be expected, the prior lawsuits raise questions of res judicata.
To understand the pertinency of these holdings a statement of the parties' basic contentions here on the merits will be set forth.
The plaintiffs claim the shares in issue as universal heirs of Thomas. Jan makes three claims. His principal contention, and the *501 only one pertinent to the question of res judicata, is that the sale memorandum and the will found in Thomas' safe, particularly when read in the light of the "Moral Testament", should be construed under Czech law to create a "sales legacy" to Jan of the entire Bata enterprise.
Applicable Czech law is largely found in the Austrian Civil Code, which is often referred to as "A.B.G.B.". There is, however, no Code provision dealing with the concept of sales legacy. It appears to be denominated indifferently as a "purchase legacy", "sales legacy", or "purchase right". Under our law, we suppose, it might be called a testamentary right to purchase.
Each of the parties invokes the rule of res judicata, or, that aspect of it now called in American law "collateral estoppel". See The Restatement, Judgments, ¶ 68(1).
Tom claims that the issue of "sales legacy" was, either expressly or by necessary implication, decided against Jan in the New York litigation. Jan claims that it was expressly decided in his favor in the Netherlands litigation. It is admitted that the Swiss judgment is not res judicata.
The following is a brief summary of these three lawsuits:
(a) The New York suit concerned certain shares of Leader. The heirs claimed title as universal heirs; Jan claimed title by oral contract of sale with Thomas in the latter's lifetime. The heirs prevailed. Basically the New York courts decided (1) that the heirs took title to the shares; (2) that there was no oral contract of sale between Thomas and Jan; and (3) that the heirs were not equitably estopped to assert their claim.
(b) The Dutch suit concerned shares of the Dutch company. They were awarded to Jan, basically on the theory of "acquisitive prescription", i.e., legal possession for three years. The Court also made other findings, including one that the will and sales memorandum created a sales legacy.
(c) The Swiss suit concerned the right of Tom as "mandator" to give instructions to the Swiss mandatories. It was decided in favor of Tom. A defense of Jan based on the sales legacy contention was rejected.
We consider first the New York judgment.

The New York Judgment.
On May 27, 1947 Marie and Tom filed in the New York Supreme Court a suit to recover from the Chase Safe Deposit Company the certificates for the 826 shares of Leader stock that were found in Muska's safe deposit box after his death. Jan and others were interpleaded.
Marie and Tom asserted ownership, as above stated, as universal heirs of Thomas Bata. Jan's claims, though not specifically set forth in his answer, were these:
(1) That he was the owner of the shares by an oral contract of sale made during the lifetime of Thomas Bata; (2) that the deed of delivery of June, 1933, effected a constructive transfer to him of all the assets of Thomas; and (3) that Marie and Tom had with full knowledge participated in the carrying out of the transfer to him of certain assets of the estate and were estopped to question his title.
The trial court resolved all these issues against Jan. In particular the trial judge found, as to defense (3) that Marie and Tom had been deceived by Jan and did not understand the nature of the estate and tax proceedings. See Bata v. Chase Safe Deposit Co., Sup., 99 N.Y.S.2d 535.
On appeal the first two findings were affirmed; but the finding of Jan's fraud prior to 1939 and of Marie's and Tom's ignorance of the matter was reversed. As to the estoppel, the Appellate Division, carefully confining its holding to the shares in suit, held that the conduct of the parties did not alter the devolution of those shares. Two of the five justices dissented. Bata v. Bata, 279 App.Div. 182, 108 N.Y.S.2d 659.
*502 We can find nothing in the opinions of the trial Court and Appellate Division to support Tom's claim that the issue of sales legacy was raised or considered, much less decided. In fact the trial Court expressly stated that Jan's claim was not founded either on the sale memorandum or on the will.
The case in the Appellate Division was decided on December 4, 1951. Jan appealed to the Court of Appeals. It was argued on May 21, 1953. Shortly before that, on April 28, 1953, the Dutch District Court decided in Jan's favor the suit filed in Holland by Marie and Tom. It held among other things that the memorandum and the will evidenced a sales legacy to Jan. This Dutch opinion was submitted to the New York Court of Appeals. Apparently the legal theory of sales legacy was advanced by Jan for the first time in his reply brief.
A reading of the opinion of the Court of Appeals shows, as the Chancellor said, that the case was finally and basically decided on the ground that no contract of sale was proved and that the plaintiffs were not estopped to claim the shares. Thus the Court said: "Both lower courts have found that neither the May 10th writing nor the will constituted a valid, enforceable contract under Czech law". Whether the two documents together created a sales legacy under Czech law was certainly not explicitly decided. Indeed, Tom and Marie argued that the issue was not properly raised for the first time on appeal, and, as the Chancellor said, it is not clear that this contention was rejected.
Tom makes the additional argument founded upon the rule of strict res judicata. He says that even if the issue of sales legacy was not litigated and decided in the New York action, yet the New York judgment is binding here as to all claims, litigated or not, because a contrary judgment here would impair rights or interests established in the first action. Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp., 250 N.Y. 304, 165 N.E. 456, 457. Justice Cardozo's opinion in the cited case shows that the rule invoked is inapplicable here. He says:
"A judgment in one action is conclusive in a later one, not only as to any matters actually litigated therein, but also as to any that might have been so litigated, when the two causes of action have such a measure of identity that a different judgment in the second would destroy or impair rights or interests established by the first. Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195, Reich v. Cochran, supra. It is not conclusive, however, to the same extent when the two causes of action are different, not in form only (Baltimore S.S. Co. v. Phillips, supra, page 321 of 274 U.S., [47 S.Ct. 600]), but in the rights and interests affected".
The Chancellor held that in the Delaware suit we are not only dealing with different property, but we are dealing with a legacy claim, whereas the New York judgment decided a contract claim. See Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195.
In view of our ultimate conclusion on the merits, further discussion of the New York suit is not required. It is enough to say that we are in complete accord with the Chancellor's statement of the applicable law and his conclusion that the New York judgment does not preclude consideration of the sales legacy question on the merits.

The Dutch Judgment.
In 1949 Marie and Tom filed suit in Holland against Jan. The case presented the issue of ownership of certain shares of the Dutch Bata Company  "Bata Best".
The disputed shares were adjudged to belong to Jan. In so holding the Dutch Court of Appeal found, among other things, that the sale memorandum and the will should be construed as creating a sales legacy to Jan. This latter holding, Jan claims, is res judicata here by way of the doctrine of collateral estoppel. Tom asserts the contrary.
*503 This issue  simple enough to state  presents several very difficult questions. We entertain no doubt that a foreign judgment, given by a court under a system of law reasonably insuring notice and hearing, as distinct from an issue decided in the course of rendering that judgment, is res judicata in Delaware, despite a dictum to the contrary in an early Delaware case. See Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95, and note in 46 A.L.R. at page 439. But the question of applying collateral estoppel to a foreign judgment is, we think, not so simple, despite defendant's able argument to the contrary.
Before dealing with this question, however, it will be helpful, first, to examine the opinions of the Dutch courts in order to determine just what those courts decided; and, second, the Chancellor's answer to the question.
In the District Court in Holland Jan first advanced three claims: an inter vivos purchase; acquisitive prescription, i. e., legal possession for three years; and forfeiture of rights. Some months later an additional claim of sales legacy was alleged as an alternative theory.
The District Court sustained the defense of forfeiture of rights. The first and principal part of its opinion deals with this point. It then went on to say that the verbal contract of sale was "plausible", and that even if it were not, the two documents would "leave scope" for the view that they contained a sales legacy to Jan.
Tom and Marie appealed. The Court of Appeal delivered a long and carefully considered opinion, consisting of 118 paragraphs.
The Court of Appeal held first that it was Thomas' intention that Jan should succeed him as owner of his property. It held that the verbal contract asserted by Jan had not been proved, but then held that the will contained a purchase legacy in favor of Jan which he had accepted. Under ¶684 of the Czech Code a legatee, upon the death of the testator, acquires a right to the legacy, but ownership may be acquired only in accordance with provisions of Chapter Five of the Code, which requires delivery, i. e., a valid legal transfer. As the Chancellor said, the Court of Appeal, having found a sales legacy, would normally have then proceeded to consider the question of a valid transfer perfecting Jan's title. Tom and Marie had denied any valid transfer. The court did not, however, proceed to consider this question, but instead took up the alternative contention of Jan that even if there had been no legally valid transfer of the legacy, he had become the owner of the shares by acquisitive prescription.
Section 1466 of the Czech Code reads:
"He who has legal possession of a movable thing for three years becomes the owner thereof by prescription".
The Court recited the facts respecting the assignment of the shares to Jan and his possession and control, and rejected the heirs' contention that Jan was a mere nominee or holder for their benefit. It concluded:
"From the above consideration it follows that in any case, regardless of the manner in which he obtained the possession of the shares concerned in the lawsuit, in virtue of par. 1466 A.B.G.B., he has since become the owner of these shares".
The court, nevertheless, proceeded to the question of "valid delivery" of the shares in suit and held that there had been such delivery.
In a later part of the opinion, the court, observing that the question of forfeiture of rights was no longer of importance, nevertheless held that the District Court's decision on this point was correct.
It will be seen that the Court of Appeal made a series of determinations respecting a number of issues presented by the case. The question is whether one or more of these determinations shall be deemed conclusive *504 in this litigation under the rule of collateral estoppel.
We turn to the Chancellor's determination of this issue.
Preliminarily, we note that the Chancellor in his discussion of the matter distinguished between the term "res judicata" and "collateral estoppel". Although collateral estoppel is but an aspect of the general rule of res judicata, we shall adhere to this terminology because, as will appear, the distinction is quite useful.
The Chancellor first noted the general rule that judgments of a foreign country are recognized under principles of comity. Iowa-Wisconsin Bridge Co. v. Phoenix Finance Co., 5 Terry 527, 41 Del. 527, 25 A.2d 383. They are not within the protection of the "full-faith and credit" clause of the federal constitution. Aetna Life Ins. Co. v. Tremblay, 233 U.S. 185, 32 S.Ct. 309, 56 L.Ed. 398. As the Chancellor said, "comity" really means that Delaware is free to adopt whatever rule it desires with respect to the effect to be given foreign judgments. 2 Beale, Conflict of Laws, ¶ 434.1. He then referred to the established rule that a foreign judgment is to be given only such binding effect as would be accorded to it by courts of the jurisdiction rendering the judgment. This Court has so held. Du Pont v. Du Pont, 8 Terry 231, 237, 47 Del. 231, 237, 90 A.2d 468, 471.
This led him at once to the question whether the courts of Holland, in a subsequent suit between the same parties on a different cause of action, would give binding effect to the holding of sales legacy by the Dutch courts. This question, admittedly one of some difficulty, he did not decide. Assuming, without deciding, that the Dutch courts would apply the rule of collateral estoppel, he passed to the question: Under what circumstances, if any, should our courts accord binding effect to judgments of a foreign country?
He assumed that the rule of res judicata would in modern times be applied to foreign judgments, notwithstanding a dictum to the contrary in an early Delaware case (Pritchett v. Clark, 3 Har. 517), but noted the difficulties in applying the rule of collateral estoppel to such judgments, particularly in cases in which there are (as here), contrary holdings in two foreign countries.
For this and other reasons he concluded that Delaware should not give automatic effect to the finding of sales legacy by the Dutch courts, and would examine the circumstances to determine what recognition should be accorded the Dutch judgment.
This is the basic holding of his opinion on the point of res judicata as applied to the Dutch judgment.
However, he also considered the effect of the "reciprocity" rule, i. e., the rule that a judgment of a foreign country will be given such effect in an American court as the courts of that country would accord to an American judgment. Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95. He held that the Dutch judgment would not be binding under the rule of reciprocity, because the Dutch courts would not be legally required to give binding effect to a Delaware judgment, such recognition being a matter of discretion with the Dutch courts.
A similar test, he then held, would be applied to the Dutch judgment, i. e., it should be evaluated in the light of the circumstances to see what effect, if any, should be given to it. He examined the findings in the Dutch opinions, considered the Swiss decision, and in the light of all the circumstances, concluded that as a matter of judicial discretion, he should not treat the Dutch determination of sales legacy as binding.
This ruling is earnestly assailed as error.
As will appear later, we are of opinion that the Chancellor's conclusion that the Dutch judgment is not res judicata here is correct. But we are unwilling to approve *505 all of the reasoning upon which he based his conclusion.
First, as to the rule of reciprocity. Plaintiffs do not claim that the Chancellor adopted this rule and based his decision upon it. They argue that the existence of the reciprocity rule justifies the discretionary rule applied by the Chancellor.
The reciprocity rule rests upon the high authority of the Supreme Court of the United States. Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95. In a five to four decision the Court held that a French judgment against an American citizen was only prima facie evidence in an action upon it in the federal courts, on the ground that by the law of France our own judgments were reviewable on their merits. The holding appears to be based on the desire to protect American nationals and to be limited to cases in which it is invoked by an American citizen. It, therefore, may not be invoked here, since plaintiffs are not citizens of the United States. See Directions Der Disconto-Gesellschaft v. U. S. Steel Corp., D.C., 300 F. 741, 747.
Moreover the rule has been severely criticized by commentators in the field of conflict of laws. See 2 Beale, Conflict of Laws, ¶ 434.2 ("an anomaly in our law"), and Goodrich on Conflict of Laws (3d Ed.), ¶ 208 (dissenting opinion "well founded"). It has not been followed in New York. Johnston v. Compagnie Generale Transatlantique, 242 N.Y. 381, 152 N.E. 121, 46 A.L.R. 435.
We note that the Hilton case holds that foreign judgments are ordinarily entitled to the same respect in this country as judgments of the courts of the states of the union. This is the general rule. See annotation in 46 A.L.R. at page 439. The Hilton case merely announced a special exception to this rule in favor of American nationals.
We do not agree with plaintiffs' contention that this holding supports the discretionary rule applied by the Chancellor. His conclusion rests upon other considerations.
He reasoned as follows:
Although collateral estoppel, like res judicata, has the merit of bringing litigation to an end, yet it often works harsh results (The Evergreens v. Nunan, 2 Cir., 141 F.2d 927, 152 A.L.R. 1187), and automatic recognition of foreign judgments may force a distasteful duty upon the court (Gioe v. Westervelt, C.C., 116 F. 1017). Since it is a judicially created rule, it should not be employed to dignify form at the expense of substance. Also, in the field of foreign law the controlling law may not be the law of the jurisdiction rendering the first judgment.
These general considerations have weight in emphasizing that the rule of collateral estoppel, often difficult of application to domestic judgments (see Judge Learned Hand's analysis in The Evergreens case, supra), presents additional difficulties when sought to be applied to foreign judgments. Cf. the comment on the Chancellor's opinion in 72 Harvard L.Rev. 573. But they do not seem to us to justify the conclusion that a question of res judicata (using that phrase in the broadest sense) should be resolved by the exercise of judicial discretion. In Johnston v. Compagnie Generale Transatlantique, supra, the Court of Appeals, referring to a prior case involving a French divorce decree, said [242 N.Y. 381, 152 N.E. 123]:
"Full force and effect was given to the French decree. The court in the end, however, disposed of the case in the exercise of discretion. It seems illogical to leave the effect of a foreign judgment in personam in individual cases to the discretion of the court".
In addition to the considerations above mentioned, the Chancellor gave considerable weight to one specific difficulty that may arise in applying collateral estoppel *506 to foreign judgments. Suppose, as here, that there are two foreign judgments reaching opposite conclusions upon the point in question. Which is to be given effect? The general rule as to conflicting judgments on the same cause of action is that the second is to be given effect, and this rule has been applied to foreign judgments in at least one American decision. Ambatielos v. Foundation Co., 202 Misc. 470, 116 N.Y.S.2d 641. The rule appears to be based upon the theory that the effect of the first judgment has been determined in the second suit, i. e., the rights acquired under the first judgment have been terminated. 2 Freeman on Judgments, ¶ 629. If this rule is applicable to cases of collateral estoppel arising out of foreign judgments, the Swiss Superior Court decision of 1957 would supersede the Dutch decision.
But Switzerland does not recognize the rule of collateral estoppel, and therefore its judgment is not entitled here to binding effect. Plaintiffs admit this. How, then, is the rule of conflicting judgments to be applied justly in such a case? The Chancellor pointed out forcefully the inherent difficulties in such a situation.
It has been suggested that in the face of two conflicting foreign determinations, involving a common question but different causes of action, the court of the forum should disregard both and should proceed at once to the merits. See the comment on the Chancellor's opinion in 72 Harvard L.Rev. 573, above cited. The Chancellor did not deal with the point, probably because the Swiss Superior Court opinion (as distinct from the judgment) was not handed down until March, 1959. Accordingly, we lay this question aside. It is not fully discussed in the briefs, no doubt for the same reason that the Chancellor did not deal with it. We shall consider only the Dutch judgment.
But, again, we do not think that this difficulty, i. e., the existence of two conflicting foreign judgments, justifies the application of a discretionary rule in determining their effect as res judicata. That difficulty may well justify the Court of the forum in refusing any binding effect to either judgment; but discretionary enforcement, in our opinion, is open to serious objection.
The rule of res judicata, in any aspect, is a rule of repose, designed to end litigation. What becomes of this rule if the court of the forum is to examine all the circumstances attendant upon the rendition of the foreign judgment? Inevitably, the court is drawn into an analysis of the correctness of the decision. And just as inevitably, we think, the tendency would be to reject a foreign judgment because of error in its law or its facts  the very thing that res judicata is designed to foreclose. Indeed, that is in effect what the Chancellor did. Of course, he fully realized that if the rule of collateral estoppel were applicable, this could not be done. But under the rule of discretion it would be proper. With many of the Chancellor's comments on the Dutch judgment we are in general agreement, as will appear hereafter. But that is not the point here. If collateral estoppel is to be applied to foreign determinations at all, we think that it should be applied, in general at least, under definite principles of law.
We turn to the question: Is collateral estoppel applicable in any respect to a determination of a foreign court?
At the outset we note the difference between Anglo-American law and the law of continental countries derived principally from written codes. The English and American law of collateral estoppel, though no doubt sometimes different in application, is fundamentally the same. But "collateral estoppel" as such does not appear to be recognized in the civil law. See the articles by Professor Millar, "The Premises of the Judgment as Res Judicata in Continental and Anglo-American Law", 39 Mich.L.Rev. 1-36; 238-266. He finds that the prevailing rule in continental countries (although subject to exceptions) is that the effect of a judgment as res judicata is restricted to *507 its dispositive part, as distinct from the premises on which it rests. Indeed, certain counsel for Jan in this case appeared on one occasion to be of that opinion. And a British writer has suggested that a foreign judgment should be deemed conclusive only "of the immediate and direct object of the litigation". Gutteridge, "Reciprocity in Foreign Judgments" (1932), 13 British Yearbook International Law, 50, 63.
This would be a simple solution to a difficult problem, but its application would in some cases permit a defeated litigant to relitigate an issue which was fundamental to the determination of the foreign judgment and which was fairly and clearly resolved against him. This result does not appear sound.
We see no reason in principle why the rule of collateral estoppel should not in a proper case be applied to a foreign judgment. It is quite true, as the Chancellor said, that there is scant American authority dealing directly with the question. But what authority there is favors the application of the rule. See Reese, "The Status in this Country of Judgments Rendered Abroad", 50 Col.L.Rev. 783, 789; cf. The Restatement, Conflict of Laws, ¶2, ¶450. Newton v. Hunt, 59 Misc. 633, 112 N.Y.S. 573. In the Newton case the Appellate Division recognized without hesitation the binding force of a finding of fact in a prior suit in a British court.
We are unwilling to hold that the rule of collateral estoppel may never be applied to a foreign judgment. The same fundamental consideration  the end of litigation  applies as well to collateral estoppel as to res judicata.
But in applying it to a judgment rendered under the civil law caution is dictated. This caution is suggested by Professor Millar's discussion of the problem. Moreover, there is a marked difference between the Code system of civil law and the common law system derived from case law. The apparent absence of citations of decided cases in continental opinions may well create especial difficulty in determining, first, the scope of the foreign determination, and second, the effect that would be later given to it by the foreign courts.
With these general considerations in mind, we turn to the question whether the finding of sales legacy in Holland is binding here.
Two questions must be answered: (1) Do the Dutch courts apply a rule of collateral estoppel to their own determinations? (2) If so, is the finding of sales legacy one which would be given such effect?
(1) Questions involving claims of res judicata in the Netherlands courts appear to be governed primarily by the Code. Section 1954 provides:
"The authority of res judicata does not extend beyond the subject matter of the judgment. To be able to invoke such authority, it is required that the thing claimed is the same, that the claim is based on the same cause and be made by and against the same parties in the same quality".
Notwithstanding the limited scope of the Code, the Supreme Court of the Netherlands has construed it to cover cases in which the controlling question decided is the same in both suits, although the cause of action is different. The test of identity applied, as stated in a 1926 decision of that court, is embodied in the phrase: "the all-governing question in dispute".
We have examined the four decisions of the Supreme Court cited to us. Each decision involved a second suit founded solely upon the identical question that had already been decided. For example, a suit to recover against a guarantor an installment due under the guaranteed obligation was dismissed on the ground that the guarantee had lapsed. A second suit was brought on another installment, and the first decision was held to be res judicata. In another case a defendant sued as a tenant on eviction proceedings established *508 that no lease had existed between him and the plaintiff. In a second suit to recover rent the first decision was held res judicata.
In a third case the subsequent suit, although founded on a different cause of action, involved a question already decided, viz., the character of a testamentary bequest.
The fourth suit involved a prior decision rejecting a counter claim seeking recission of an agreement. The first decision was held to be res judicata in a second suit asserting the same counter claim.
These decisions, we think, fall short of clearly establishing as Dutch law the rule of collateral estoppel that obtains in many, probably in most, American jurisdictions. See 2 Freeman on Judgments, ¶ 688: "the conclusiveness * * * extends to every question in issue and determined by the court". Our extensive body of law on the question of which issues are res judicata bristles with close and difficult questions of distinction between "evidentiary" or "collateral" facts or "mediate data", as opposed to "ultimate facts". By contrast, Dutch rule seems narrower, and limited to cases in which the "all-governing" question is the same. Compare the discussion by Professor Millar in the article above cited.
The experts who testified below were in substantial agreement that the test of res judicata in Holland is the identity of "the all-governing question in dispute", or of the equivalents of this phrase: "the overriding issue", or "the all-dominant question". (Plaintiffs' expert added the word "single", i. e., "the single all-governing question", but this word does not seem to occur in the cases, and we rest nothing upon his use of the word.)
Of course the experts are in disagreement as to what was the all-governing question in the Dutch suit.
Counsel for defendant cite some statements of legal commentators, and insist that the Dutch rule, like the majority rule in this country, extends to any finding necessary to sustain the judgment. It is quite doubtful whether these comments are intended as opinions that the Supreme Court of the Netherlands has broadened the rule of res judicata to that extent. At all events, we decline to adopt a rule not clearly or satisfactorily enunciated by the Supreme Court of the Netherlands.
(2) Our second question is whether the finding of sales legacy would be given the effect of res judicata. Our inquiry must therefore be: Was the issue of sales legacy the "overriding issue" in the Dutch Court of Appeal's decision?
The opinion embodies the following findings:
1. It was Thomas Bata's intention that Jan should succeed him as owner of the Bata enterprise.
2. Jan's claim of a sale inter vivos is not established.
3. The will and sales memorandum embody a legatum venditionis causa  a sales legacy.
4. Jan has become the owner of the shares in dispute by acquisitive prescription.
5. There was a valid transfer of the shares, at least by tacit consent.
6. The heirs have forfeited their rights.
Which of these findings determined "the overriding issue"?
Obviously, neither finding 5 nor 6 was so regarded by the court itself, because the opinion states that they were superfluous.
An analysis of the opinion leads us to the conclusion that the basic holding of the court was that Jan had acquired good title to the shares there in dispute by acquisitive prescription. Ae we have said above, the court, after holding that the will and memorandum embodied a sales legacy, did *509 not proceed to determine whether the property covered had been legally transferred to him. The court held that this question "is of no importance if Jan Bata's invocation of acquisitive prescription can be accepted".
The court then referred to the decision on sales legacy as establishing that Jan had a "legal claim" to all the shares of the companies. It found, as was admitted, that Jan Bata had had actual control of the shares in suit for more than three years. It emphasized the fact that the heirs had voluntarily transferred the shares to him, and that he had thereafter exercised the rights of owner. It rejected the heirs' contention that Jan held the shares as "Inhaber", i. e., as nominee or agent.
It proceeded to apply the requirements of prescription set forth in ¶ 1460 of the Czech Code, which reads:
"1460. In addition to the capacity of the person and the thing, prescription requires that there be actual possession by someone of the thing or the right that is to be acquired in this manner; that his possession be lawful, in good faith, and true, and that it be continued during the entire time prescribed by law. (¶¶ 309, 316, 326, and 345).
It then held that Jan's possession was "rightful", because based on a legally valid title (sales legacy), "reasonable", because he considered himself as owner, and "real", because his possession was not based on fraud or violence.
It concluded, as above stated, that Jan in any case, "regardless of the manner in which he obtained the possession of the shares * * * has since become the owner * * *".
The Chancellor's comment on this holding is:
"Clearly the Dutch court did not declare Jan to be the owner of the Dutch stock on the ground that the will created a sales legacy in his favor which he had accepted and which had been legally transferred to him. Rather, under its acquisitive prescription determination the court used its sales legacy determination as the basis for finding that Jan had a legal claim or title, a necessary element in determining that acquisitive prescription was present. However, Jan also had to prove rightful possession under that doctrine".
We agree. The finding of sales legacy was not the fundamental basis for upholding Jan's title. It was used to supply one of the three code requirements for lawful possession.
Applying the test of the language of the Supreme Court, we think it clear that sales legacy was not the all-governing question decided by the Court of Appeal; the fundamental finding was acquisitive prescription. Defendant's expert witness testified to the contrary; but we cannot accept this opinion. Why should sales legacy be singled out as the "all dominant issue", since the court did not, in its treatment of the point find that the subject matter of the legacy, i. e., the Bata "concern", had been transferred to him? Defendant's expert admitted that the finding of acquisitive prescription was not a superfluous finding, but insisted it was not "the overriding issue". This reasoning we cannot follow. Under the test announced by the Supreme Court of the Netherlands, we think that the legacy point was not the "all-governing" issue in the Court of Appeal's decision. That issue was acquisitive prescription.
Support for this conclusion is found in subsequent proceedings in Holland.
The heirs appealed from the decision of the Court of Appeal to the Supreme Court of the Netherlands. Since only questions of Dutch law are considered by that court, its decision affirming the judgment is not *510 significant here. However, under Dutch practice the Attorney General files his opinion. In that opinion he stated that the Court of Appeal had rejected the heirs' claim to ownership on three grounds: (1) prescription; (2) valid delivery; and (3) forfeiture and estoppel. The second and third findings, he said, were non-essential grounds. No mention was made of the finding of sales legacy. A reasonable inference is that the "all-governing question" was, in his opinion, acquisitive prescription.
There exists also for our guidance a decision of another Dutch court  the Restitution Court of the Council for the Restitution of Rights. This decision is dated August 12, 1959, and hence the Chancellor did not have the benefit of it.
The proceeding was brought by Leader, the Swiss Company, against the Dutch Company, Bata-Best, Jan Bata, and the Kingdom of the Netherlands. Its object was the nullification of the issue of an additional block of shares of Bata-Best issued in 1942 under the German occupation. The issue was claimed to have been made under duress. Jan opposed the relief sought. He contended that the nullification of the shares would prejudice his position in Bata-Best, because Leader would then control Bata-Best; whereas he had been recognized in the Netherlands as the owner of the Bata concern "in its entirety". He invoked the legacy finding of the Court of Appeal, and argued "that the decisions implied in the reasoning of the judgment obtained the force of res judicata", although the formal issues concerned only 225 shares of Bata-Best.
Leader argued that the Court of Appeal decided only that Jan had become owner of the 225 shares by acquisitive prescription; and further argued that, assuming that the Court of Appeal had decided that Thomas had intended to transfer all his assets, yet whether that intention had been carried out was investigated only with regard to the 225 shares, and that the Court of Appeal did not decide that any Leader shares were transferred or bequeathed to Jan. Leader also referred to the litigation then pending in Switzerland and in America with respect to the ownership of the majority block of Leader shares.
The Court found that the issue of the new shares in 1942 was effected under duress. The Court held that its sole concern was to rectify an improper situation that resulted from the war, and not to redress alleged wrongs having no concern with the war.
The Court, however, went on to say:
"Whereas the Court wishes to point out, moreover, that the view taken by Jan Bata that he is entitled to all power in the Bata concern, and that this has been established within the jurisdiction of the Netherlands, appears incorrect, since such a far-reaching decision is not contained in the judgment of the Amsterdam Court of Appeal and, even if this were otherwise, it would not bind Leader; consequently, since in Switzerland as well as in the United States of America, the struggle for the position of power in the Bata concern is still continuing between the interested parties, and since the Leader shares are also involved in this dispute, Leader has rightly stood up in the present case as an independent legal person for its own interests, * * *".
The above is a judicial utterance supporting our conclusion. True, it is what we would call dictum; but it is none the less persuasive.
Defendant invokes a decision of the Dutch Court of Appeal in which the prior decision on the sales legacy question is referred to as conclusively deciding that "Jan Bata was designated as the owner of the entire industrial property of Thomas Bata, Sr." This suit concerned the calling of a stockholders' meeting of Bata a.s., the Czech company. The heirs were not parties. The suit was brought by Cipera and Hynek Bata. Defendant says that they *511 were in privity with the heirs, but there is no finding to that effect. No question of the Dutch law of res judicata was passed on. The Court's reference to the prior decision seems to have been by way of citation of authority (as we would put it), and not as a holding that the "overriding issue" was the same in the two cases. The case simply decided that Jan had the right to call a stockholders' meeting.
Another decision is also referred to, concerning a similar dispute. Jan brought a suit to compel the issuance to him of a proxy covering shares of Bata a.s. held by Marie's estate. The District Court made an order to that effect, and referred to the prior decision as designating Jan as the owner of the "entire industrial property" of Thomas. The decision was reversed on the ground that the application was premature.
Once again, we fail to find in this reference by the District Court to the prior decision of the Court of Appeal any persuasive holding that the broad question of ownership was res judicata under Dutch law.
It is our conclusion that the decision of the Dutch Court of Appeal with respect to the question of sales legacy is not binding upon us in the case at bar. The suit before us is for ownership of Leader shares which were not before the Dutch Court. The Dutch Court was dealing only with the shares representing the minority interest of Bata-Best originally registered in Thomas' name and delivered to Jan after the death of Thomas. Consequently, the "all-governing question" or "overriding issue" of acquisitive prescription relates only to those minority shares. These shares obviously stand in a different position from the bearer shares of Leader. Even if the Dutch judgment is entitled to collateral estoppel effect in a subsequent suit involving the ownership of minority shares of other companies of the Bata enterprise acquired by Jan under similar circumstances, it can have no collateral estoppel effect in a suit brought to obtain title to Leader shares which, as will be seen, stand in entirely different circumstances.

The Swiss Judgment.
Since it is admitted that the rule of collateral estoppel is not recognized in Switzerland, it is unnecessary to consider the Swiss decision at this stage of this opinion. It will be referred to hereafter.
Having concluded that neither the New York judgment nor the Netherlands judgment is binding upon us, we now turn to the merits.

The Merits.
The question for decision concerns the ownership of the 1,170 shares of Leader now deposited in the Court of Chancery.
We start with the proposition that by virtue of the Czech Code and the estate proceedings Tom and Marie, as universal heirs, succeeded to Thomas' title to all his estate, including the Leader shares. This is not disputed. Tom asserts that nothing has occurred to divest the heirs of that title. Jan asserts three grounds upon which he claims ownership.
(1) The sales memorandum and will ("codicil") embody a sales legacy to him of the entire Bata enterprise.
(2) Even if this be not so, he has acquired good title to the Leader shares under the Czech legal doctrine of "constitutive recognition".
(3) In any event, he has acquired such title under the Czech doctrine of "tacit waiver".

Sales Legacy.
Jan's claim of sales legacy is based upon the sale memorandum and will found in Thomas' safe after his death. The circumstances surrounding the finding of these papers have been related. We now set forth the documents in full:
*512 The Sale Memorandum, dated May 10, 1931:

I, the undersigned Tomas Bata sell to you J. A. Bata and you purchase from me all shares of Bata akc. spol. Zlin as well as all shares of the construction company "Zlin" then all shares of the company "Tisk" then participations in the Libstat establishments.
Of foreign companies I sell to you the following shares or participations: Company, Bata Schuh Aktiengesellschaft Zurich nominal value frc. 450,000.-

Bata Matschapai Amsterdam 51,000 Hol. fl.
Bave " " 20,000 Hol. fl.
Bata Cipele i koze Zagreb 2100,000 Dinars
Bata Krakov 100,000 Zl.
Bata Bukarest 2000,000 Lei
Bata Alexandria 2,250 £
Bata Copenhagen 400,000 D. Kr
Bata Strasbourg 600,000 Frc

*513 From the sold property is further excluded the debt which we have against the city in the amount of approx. 4300,000 that is by such amount the purchase price is increased and J.A. Bata is under obligation to pay such amount to the city of Zlin. (signed) Tomas Bata

 [second page]
Bata Stockholm 40,000. Kr
Bata Deutsche Schuhe A. G. Berlin 110,000 Rm.
Bata Vienna 20,000 S.
Bata Shoe & Leather Lynn 15,000 $
Bata " New York 400,000 $
 I sell to you shares
Further also of domestic companies
Bapoz spol. s. r. o. 400,000 Kc
Paris akc. spol 500,000 Kc
Atlas insur. 3,000,000 Kc
Busi Trebic 10,000,000 Kc
Budisovsky Trebic 10,800,000 Kc

From these values I exclude is excluded the landed property
Loucka a Lazy as well as my residential house in Zlin
Besides these enumerated values included are in the sale I sell to you all ym my property even if it is not enumerated here for the amount of Kc 50,000,000 fifty million K.c. Czechoslovak currency. You are under obligation to pay this purchase price in cash within one year from taking over the companies and to pay 5% interest pro ano 7/13,32 note:
I agree and purchase; (signed) J.A. Bata (signed) Tomas Bata that is to say, I agreed and purchased as per oral agreement.
*514 The will, dated May 19, 1931:

 [first page]
 S1 25/32
 --------
 1
 My last will:
Made on the day 19/5 1931
My property as of today
consists of
 Claim against J. A. Bata
 of
for all shares sold xx
domestic and foreign comp. Kc 50,000,000
My dwelling house in Zlin 100,000
Landed estates Loucka and Lazy and Schmergerle 3,000,000
Claim against the City of Zlin  About 4,300,000
 ___________
 57,400,000
 -----------
From this my property I bequeath
To my wife Mrs. Marie Bata
Landed estates Loucka Lazy Schmergerle  3,100,000
Further in cash  Kc 5,000,000
To my son Tom Bata his legal
quota Kc 22,000,000
with the provision that this his
property shall be administered by his mother
until he reaches 22 years of age.
The proceeds shall be used for his education
and the remainder shall be deposited for his benefit.
 ___________
 30,100,000

*515
 [second page]
 Carried forward 30,100,000
To my sister Anna Schiebel I bequeath 1,500,000
To the City of Zlin the debt 4,300,000
with Bata a.s. J.A. Bata will pay
The balance  Kc 21,500,000
 ___________
 57,400,000

I give to my fellow workers
 is to be paid
 is payable within 5 years with 5% interest
This amount is to be paid in cash
to the Bata Workers Benevolent Fund and is to be
administered in the spirit of the now effective
by-laws.
 It is understood that I have drawn up
 this last will with full understanding
 being of sound mind and without duress
 and in my own handwriting.
 /s/ Tomas Bata
 My previous testament hereby
 naturally loses its validity.
 /s/ Tomas Bata
 Published at the District Court in Zlin
 on the 13th day of July 1932.
[Seal of
the District Court
in Zlin] /s/ Loucka Bohumil
*516 Two questions at once arise: (1) What is the legal effect of these two documents under Czech law? (2) What did Thomas Bata intend to accomplish by them?
First, as to legal effect. It is admitted (as was held in New York) that the sale memorandum is not a valid contract of sale under Czech law. It never left Thomas' possession. Jan had never seen it. Jan's claim in the New York litigation was that there had been an oral contract of sale in Thomas' lifetime, but that contention has been conclusively resolved against him.
Jan's claim must therefore rest upon the will and sale memorandum, either or both. The two documents, it is said, evidence an intent to grant to Jan a testamentary right to purchase, i.e., a sales legacy to take effect after death. Conceding that the inter vivos sale was a fiction, adopted for the dual purpose of preventing disclosure of the real estate and of avoiding taxes, Jan argues that there is nothing inconsistent between the accomplishing of these purposes and the legacy to him.
The insuperable difficulty with this argument is that there is nothing in the will to support the idea of any legacy to Jan. The will is clear enough; it simply disposes of a supposed estate of 50,000,000 crowns represented by a debt of Jan Bata to Thomas.
The Czech law of will construction does not seem to differ greatly from our own. Code Section 582 provides:
"A disposition of the testator made by reference to a note or writing, is effective only if such writing complies with all the requirements necessary for a valid last-will declaration. Otherwise, such written remarks indicated by the testator may be used only for the interpretation of his intent".
Clearly the sale memorandum cannot be construed as a will, if for no other reason than the fact that the other document was clearly intended to be the will. May the memorandum be used to interpret Thomas' will so as to read into the will a sales legacy?
The Chancellor held not; and we agree with him. Many decisions of the Austrian and Czech courts were cited to him, as well as the writings of legal commentators. These authorities are all carefully considered and analyzed in the Chancellor's opinion. They all support, in one way or another, the rule that "the interpretation of a testament must have some, however slight, support in the testament and must not be totally contradictory to the clearly expressed intent of the testator". (Austrian Supreme Court decision, July 18, 1952.)
In the instant case there is not the slightest hint in Thomas' will of any intent to bequeath anything to Jan. The will is predicated upon a supposed claim against Jan, arising out of a fictitious sale. As the New York Court of Appeals said, the will disposed of a non-existing asset.
It is unnecessary to analyze the applicable Austrian and Czech decisions. All of them have been read. Many of them concern the question whether a statement or a writing, somewhat ambiguous, was intended to have testamentary effect. Thus, in one case the deceased left a will in which he provided: "The statutory right of succession of my wife, who is separated from me, is untouched". This statement, supported by extrinsic evidence, was construed as a bequest.
Here we have nothing to construe.
Jan's counsel argues that what Thomas did here was to leave "a disguised legacy". The cases indicate that the Czech courts will give effect to such a legacy, but, again before that can be done some testamentary provision, or some utterance or document intended to have testamentary effect, must afford the "hint" or "clue" to the testator's intention. The "supplementary interpretation may take place, only then, `when the declaration itself offers some basis for supplementing the declaration'." Klang-Handl, *517 Commentary to the General Civil Code (A. B.G.B.).
We can add nothing further to the Chancellor's discussion of the applicable Czech law.
Mention should be made, however, of the holdings of the Dutch Court of Appeal and of the Swiss Superior Court on this question. The reasoning of the Dutch Court is not, we think, persuasive. Although the court cites ¶ 582 of the Code, it does not attempt to examine the Czech decisional law construing this section. Hence the requirement of Czech law that some hint of intention to create the legacy must be found in the will itself is ignored. We are inclined to think, as the Chancellor did, that the court's basic finding  that it was Thomas' intention to leave all of his shares of stock to Jan  colored the whole opinion. As we shall see, this finding of underlying intent rests on very dubious grounds.
Moreover, the court stated flatly  ignoring the uncontradicted evidence in the New York case  that there was no reason to suppose that the value of Thomas' estate differed much from the value assessed by the tax authorities  $8,000,000. Also, the Court Appeal took the view that to attribute to Thomas Bata an intent to evade taxes was "a grave misjudgment" of his personality. This view we cannot help regarding as somewhat naive.
The Swiss Superior Court reached the opposite conclusion. Jan (apparently as an afterthought) asserted the existence of a sales legacy. The court said that the sales memorandum could not constitute a valid testamentary disposition, and also held that the will setting out the claim against Jan could not cure this defect since "the testator in no manner expressed the intent of, or even hinted that he was thinking of, a legacy * * *". Thus the Swiss court applied what we have found to be the Czech rule of interpretation of wills by reference to extraneous documents.
We must, however, carefully analyze Jan's argument to the contrary.
Accepting the rule that some hint of the claimed legacy, however slight, must be found in the May 1931 documents, he argues (1) that the hint may be found in either document, and (2) alternatively, that the two documents may be treated as one and, read together, evidence an intent to create a testamentary bequest to Jan of all of Thomas' shares upon Thomas' death. Under either approach to the problem, he says, the documents should be read in the light of Thomas' background and his philosophy of social responsibility, which tend to show that he intended Jan to succeed to absolute ownership and power in the Bata enterprise.
We have had some difficulty in following the development of this argument, and we note that the Chancellor had the same difficulty. What counsel seem to be saying is that any one of three constructions of these documents supplies the necessary hint of Thomas' intent, and the extrinsic evidence of Thomas' philosophy supplies the reason for the intended bequest.
The very multiplication of possible constructions of the papers emphasizes the difficulty of finding any hint of a sales legacy in either of them and the weakness of defendant's argument on the point.
First, as to the sale memorandum. How can this meet the requirement of the "hint" rule? The Czech rule, as we have seen, is that the hint must be found in the will. We repeat that this is not a case in which it is possible to construe the memorandum as a will, because the other document is beyond doubt intended as the will. Moreover, counsel concedes, as we read the briefs, that the memorandum is drafted to avoid any suggestion in any of its words that the disposition to Jan was for the event of death. This is clearly the case; therefore the sales memorandum cannot meet the "hint" requirement of Czech law.
*518 Second, as to the will. It is clear to us, as it was to the Chancellor, that the will contains no suggestion of a legacy to Jan or any provision for his benefit. Again, counsel concede that the will is carefully drawn to avoid words suggesting any testamentary disposition to Jan. Naturally, it was so drawn, since to have left a legacy to Jan would have defeated Thomas' purposes  secrecy and tax evasion.
Jan's alternative contention  that the two documents may be treated as one  has some surface appeal. It is buttressed by the further argument that the extrinsic evidencethe "Moral Testament"  shows that Thomas intended Jan to succeed to ownership and power.
But it will not bear analysis. Reduced to its simplest terms, it is an argument that the memorandum must be read as a part of the will. In effect, this is the view taken by the Dutch Court of Appeal. We have already considered it. It runs afoul at once of the Czech Code (¶ 582, quoted above) and of the Czech decisions. No argument based on extrinsic evidence can avail to expand the language of the will to include a reference to the sales memorandum as a part of the will.
Moreover, the extrinsic evidence of Thomas' intent that Jan should succeed to both absolute ownership and power falls considerably short of being convincing. It is based on certain writings of Thomas, one the so-called "Moral Testament" and another an article published in a newspaper in 1927, entitled "My Attitude Towards Work".
The "Moral Testament" is headed: "To Accompany My Last Will". As above stated, it was found in the safe in May, 1932, after Thomas' death. It develops the idea that the Bata factory had not been built simply for the benefit of the founders and owners; that it had a higher purpose in furthering the general well-being of the community, both workers and customers. It concludes:
"So long as you will serve this great idea, so far you will live in accordance with the laws of nature and of man. So long will you be useful to all and so long will you be unconquerable. However, as soon as you will think only of yourselves, as soon as you cease to serve with your factory the commonwealth, you will become superfluous and you will fall inevitably".
We are told that it was written in 1908. At that time Thomas had not been married and Jan was ten years old.
However praiseworthy its philosophy may be, the "Moral Testament" certainly does not contain anything pointing specifically to any successor. The "testament" must have been addressed to any future owner or owners of the business.
The 1927 article sets forth Thomas' attitude toward work. It concludes:
"My work has only one purpose: the service to life. I admire life. I love life. I wish to live through it ten times in sequence without a change, or under any conditions. I wanted to have 10 sons; not so that I will be able to divide my fortune among them, but to teach them how to live and work.
"Now I have thousands of sons, if only one who bears my name. I shall leave my fiddle to the best of them all; but so that he may play for others and not for himself.
"My son has not even the prospect like many a son of poor parents  to become gentlemen. He will not study in a college, the less in a university. After having finished the high school, he will become a free thinking craftsman like his father is.
"He will have just as much property as he will earn himself. He will anyhow have large advantage over the others, because he will have at his side more experienced advisers and certainly I shall not forget to draw his attention *519 to the suitable opportunities". (Emphasis supplied.)
The "fiddle" metaphor derived from a prior reference to his property as similar to the violin of a musician. Counsel argues that this utterance, read in the light of the "Moral Testament", forecast the choice of Jan as "the best of them all".
There are several difficulties with this argument.
First, in 1927 a will written by Thomas in 1918 was in effect. It made substantial provisions for his widow and for his son, then five years of age, as well as for Jan Bata. During Tom's minority control was to be separated from ownership, but after Tom should become of age working control would revert to him. It is hard to reconcile the existence of this will with counsel's construction of the 1927 article.
Second, Jan in 1927 was not even employed in the Bata business, having left it temporarily for about a year because of his desire to build his own home rather than live on company-owned property.
There are other considerations strongly rebutting the inference that Thomas intended by the May 1931 papers to vest absolute title and control in Jan.
There is the inherent improbability in imputing to Thomas an intent to cut off his widow and son with a very small fraction  about one-thirtieth  of his estate; and the further improbability of cutting off his son, whom he was grooming for leadership, from any assurance of control of the enterprise.
There is the admitted fact that the whole scheme of an inter vivos sale was a fiction designed to conceal the assets of the estate and to avoid crippling inheritance taxes. It was so found in New York. The Appellate Division said:
"The so-called agreement of sale dated May 10, 1931, and the will of Thomas Bata dated May 19, 1931, appear to have been designed chiefly, as Mr. Justice Schreiber has said, for tax purposes". 279 App.Div. 182, 108 N.Y. S.2d 659, 660.
Counsel for Jan argue that this fiction is not inconsistent with an intent to leave the whole property to Jan, but we do not agree. The price fixed for the "sale" was at the most one-twentieth of the real value of the property.
Again, as heretofore noted, payment of the debt of Thomas Bata to Bata a.s. of 35,000,000 crowns  over a million dollars  would have wiped out the bequests to the widow and son. This circumstance suggests that the provisions of the documents were not intended to be followed literally. The same inference can be drawn from Thomas' treatment of the real estate. He did not even explicitly devise his residence to his widow; and after making the will he transferred to Bata a.s. other real estate that he had devised to her.
What, then, it may be asked, did Thomas Bata really intend or expect when he drew up the two documents in May, 1931?
This is the second question that we posed at the outset of the discussion of the merits.
Any answer is in the relm of speculation. It may be that Jan was intended to be a mere nominee or agent of all the property  on the theory that his relationship to the heirs would be "flavored with a trust", as the Chancellor put it.
Or it may be that Thomas intended Jan to have the full title to all the property, but, "in the expectation that Jan would treat it as a mere simulacrum and do what was right" as regards Tom and Marie. Per Van Voorhis, J., 279 App.Div. 182, 108 N.Y.S.2d 659.
Again, it may be that the transaction was incomplete, i.e., that Thomas intended at some time to supplement the 1931 documents by a later will or by a private memorandum to his family, and that his unexpected death prevented him from so doing. *520 Some slight support for this possibility is found in the following incident.
In December, 1931, while traveling by airplane to India, Thomas wrote a note book or series of entries and comments. Among them is a reference to a recurrence of an old ailment  thrombosis  and the writing of another will en route. Later he records the fact that his leg stopped hurting and adds: "I tore up the last will". Perhaps it is inferable that the 1931 documents were not complete.
There is another possibility not mentioned by any of the courts that have reviewed this puzzling set of facts. It may be that Thomas intended  or hoped for  some sort of division of the enterprise  the Leader shares and ultimate control to his wife and son  Bata a.s. and the minority shares, registered in Thomas' name, to Jan with active control of the entire enterprise to be in Jan until, at least, such time as Tom was able to accept the responsibility. Such an intention on the part of Thomas would have been consistent with his business philosophy.
This theory finds some support from the fact that, by his 1918 will, Thomas left Jan a substantial interest in the enterprise1,000,000 crowns  or roughly onetenth of the value of the enterprise as it then existed. Also, by his 1918 will, Thomas left ultimate control of the entire enterprise to his son, Tom, but provided that that control should be deferred until a future date.
Further support for this theory is found in the fact that the Leader shares are not mentioned as such in the papers  it is only from the use of the word "majetek" (all my property) that Jan is able to build an argument that he acquired them. The papers list only stockholdings which, since they were registered in Thomas' name and had been reported to the Czech authorities, obviously could not be concealed for tax evasion purposes. Each of these listed stockholdings was assigned a value (possibly the par value). The exception was Bata a.s. which had never issued any stock in Thomas' lifetime but which, nevertheless, was known to the Czech authorities as the property of Thomas.
Under this assumption, therefore, Thomas' intention was carried out, viz., concealment from the Czech tax authorities of the value represented by the Leader shares and sixty percent of the value of the foreign companies. His intention, also, of control of the enterprise, at least until Tom could take over, was assured.
Finally, it may be that Thomas intended the documents as an outright bequest to Jan of the entire Bata enterprise, without any reservation or expectation whatever.
We have suggested a number of possible answers to the question, What was Thomas' intent? There are obvious objections to each of these answers. We have suggested them solely to emphasize the uncertainty surrounding the matter, and the unsoundness of attempting to build up from extrinsic evidence a supposed intent and then to construe the documents in the light of that intent. This, we say with respect, is in our opinion the fundamental error into which the Dutch Court of Appeal fell. Any conclusion founded on such a basis is not to be trusted. It is impossible to be sure what was Thomas Bata's actual intention.
We fall back, therefore, as the Chancellor did, on the principles of the Czech law of will construction. The Chancellor said:
"As I find the Czech law and without regard to the testator's actual intention, it must be concluded that Thomas Bata did not by his May 19, 1931 will create a sales legacy in favor of Jan". 139 A.2d 195.
In other words, even if Thomas Bata actually intended to create a sales legacy in favor of Jan, he did not take the necessary legal steps to accomplish it.
We are in accord with the Chancellor's conclusion.

*521 Constitutive Recognition.
This doctrine of Czech law is the basis for Jan's second claim of title. It is a rule judicially evolved. The Czech Supreme Court has defined it thus:
"A contract whereby without mutual concession by the parties a legal relationship is determined. * * * The agreement * * * is not a mere admission of a fact, but is in the nature of a disposition concerning a legal relationship in the same way as a compromise". Decision of Czech Supreme Court, August 23, 1928.
In that case it appeared that the parties had engaged in certain business transactions. Plaintiff had asserted a claim and defendant disputed it. Later defendant acknowledged the debt. This acknowledgment was held to be a valid recognition.
The doctrine may perhaps be analogized to our rule of compromise and settlement, except that in Czech law no consideration is required. The prior legal relationship supplies the "causa", or prior obligation or claim which is the basis of the recognition. Cf. Decision of Czech Supreme Court, March 9, 1928.
This rule "is based on the principle of freedom of contract", and "creates a new cause of action". Decision of Austrian Supreme Court, May 14, 1918. It is an independent source of obligation. Decision of Austrian Supreme Court, January 9, 1923.
The person sought to be held must have "intended to commit himself anew", and this is a question of fact. Decision of Austrian Supreme Court, Sept. 5, 1930.
There must be some dispute or uncertainty which is resolved by the recognition. Decision of Austrian Supreme Court, March 27, 1930.
The definition given by Jan's expert witness is as follows:
"Where the recognizing party, the recognizing person is connected with the other party by a past factual basis, by a series of facts which amount to an incomplete, doubtful, disputed, or unenforceable obligation, recognition makes this relation perfect, final, definitive, and enforceable".
His opinion that the doctrine applies to this case was apparently based on a supposed ambiguity in Thomas' will. Asked what was the past factual basis, he testified:
"A. The connection created by a last will declaration. What I assume is that no sales legacy was expressed in the documents of May 10 and May 19. The last will, the expression of last will wish, the expression of a last will disposition which was not clear, and wherever heirs remove a lack of clarity with regard to a legacy by recognizing or fulfilling the legacy in spite of the ambiguous expression, there the doctrine of constitutive recognition works". (Emphasis supplied.)
This opinion seems to lead us back to the main question: Is there something in the words of the will indicating a legacy? We have already answered it in the negative.
Jan's claim is (in effect) that the conduct of the heirs evidenced a recognition of the legacy. We note that in most of the Czech cases there is proof of an express contract of recognition. Of course, nothing of the sort exists in this case, that is, an express contract between Jan of the one part and Tom and Marie of the other part. Jan relies, as he must, upon a tacit recognition growing out of the conduct of the heirs in settling the estate and carrying out the supposed inter vivos sale.
The recognition may be tacit, but "a tacit declaration of intent can be assumed only if the facts, with consideration of all circumstances, do not leave any ground for a reasonable doubt as to the intent of the party". Decision of Austrian Supreme Court, October 21, 1891.
*522 The conduct of the heirs relied upon as evidence of "tacit recognition" of Jan's title is, of course, in the first place, the series of acts taken after Thomas' death to carry out the fiction of the inter vivos sale. The most important of these are: the acceptance of Jan as "the Chief"; the transfer of the minority shares to Jan; the acceptance of the book credits; a payment of legacies and inheritance taxes; and the declaration in lieu of oath in the estate proceedings. In the second place, much is made of the long lapse of time during which the heirs failed to challenge Jan's position  during which, Jan argues, they recognized him not only as the Chief but also as the owner.
The answer to the first point is plain. The acts and declarations of the heirs in settling the estate, whether considered singly or as a whole, were not taken or made as a compromise or disposition of any disputed claim, or with any intent on the part of either Tom or Marie to create a new cause of action or to commit themselves anew. There was no dispute or questioned claim whatever  certainly no evidence that the heirs were conscious of any. These acts and declarations were done and made alio intuitu, for a purpose wholly different  the carrying out of the fiction of the inter vivos sale. Because of the grave need for concealment, and the need to evade crippling taxation, it was to the interest of all the parties to work together to set up a fictitious screen behind which the Bata business could continue to function as it did during Thomas' lifetime. It is a fair inference that the parties were indifferent to legal concepts in carrying out their main purpose. Certainly it was sufficient for Marie to know that Thomas Bata "wanted to have it like that"; and one cannot imagine that Tom, a youth barely eighteen, had any different thought about the matter. Jan and Cipera, we may be sure, fully understood the need to carry out the fiction.
It cannot reasonably be said that the conduct of the heirs evidenced any recognition of any sales legacy to Jan. Indeed, no one ever thought of sales legacy until years later, after the trial in the New York Supreme Court.
As to the second point, it is quite true that for years no question of ownership was raised by the heirs. Nor was it clearly raised by Jan. The truth of the matter seems to be that the primary motive with everyone was to carry on the Bata enterprise in the tradition of Thomas Bata. The taxing authorities had obligingly accepted the fiction of a sale, and thereafter it was not to be expected that the heirs would have "rocked the boat", as the Chancellor put it.
Finally, none of these alleged acts of recognition of Jan's legal and beneficial ownership of the minority shares has any application to the Leader shares. These are the shares in dispute. None of the Leader shares was ever assigned or delivered to Jan. As we shall see, in discussing the next question in the case, he never had possession of any of them.
One incidental argument, however, should be noticed.
Jan seeks to make some point of the method of handling the Leader profits. During Thomas' lifetime, Thomas took no credit for profits on Leader's books, although his associates had such credits. Jan had participated in the profits of certain departments, but received no participation after Thomas' death. This, he says, is evidence that he succeeded Thomas as owner. This failure to receive further participation was, according to Cipera's testimony in the New York suit, attributable to his own inaction.
An argument is also made that Jan, as owner of Leader, personally guaranteed the payment of Cipera's credits on Leader's books. The evidence does not warrant this conclusion. It only shows that Cipera was advised by Jan that Cipera's credits would be paid to him on request.
*523 We think that the evidence fails to show any intention on the part of any of the three parties to enter into any recognition contract after the death of Thomas. Certainly, as the Chancellor said, the evidence leaves room for a reasonable doubt.
We agree with the Chancellor's holding on this question.

Tacit Waiver.
Under Czech law tacit waiver is the "continuing failure to exercise a right where, considering the circumstances of the particular case, the other party was justified in relying on the assumption that the transaction had been finally wound up". Klang-Gschnitzer, Commentary to the General Civil Code.
Tacit waiver is solely a matter of defense: it is available only to a person in possession.
The Chancellor found, on evidence clearly justifying his finding, that Jan never had possession of the Leader shares in suit.
We affirm his finding. We have not overlooked counsel's long and ingenious argument built upon the circumstance that Muska for some period had a safe deposit box in London in the joint names of himself and Jan. It is claimed that the Leader shares were deposited in this box for the account of Jan. We find the contention quite unconvincing.
We can add nothing to the Chancellor's opinion on this point, which, to the extent that it deals with the matter of possession of the Leader shares, is hereby adopted as the opinion of this Court.
The above conclusions dispose of Jan's three contentions with respect to the shares in suit.
However, before concluding the discussion of this case, we must make quite clear the basis of our decision that the Leader shares in suit are the property of the plaintiffs. We hold (1) that title to these shares vested in the heirs by the deed of delivery of the Czech court, and (2) that Jan has not succeeded in divesting the heirs of that title on any of the grounds urged in this case.
We decide nothing with respect to the ownership of the minority shares, concerning which much is said on the briefs. The New York courts, in awarding certain Leader shares to Tom and Marie, were careful to make the same distinction. Referring to the transfer to Jan of certain minority shares, as well as the agreements relating to the shares of Bata a.s., the Court of Appeals said:
"The status of these securities, however, must be evaluated in their own setting". 306 N.Y. 96, 115 N.E.2d 672, 677.
Moreover, it is not necessary for the present decision to decide the difficult question of Jan Bata's status with respect to the heirs during the years when he was administering the Bata enterprise. Was he a sort of agent or trustee? Certainly, as the Chancellor said, no specific agency or trust was ever proved. Or was he acting primarily for himself under claim of right adverse to the heirs? Or was he merely with the consent of all "the Chief" and the owner of an interest in the enterprise? The answers to these questions are important in dealing with the minority shares, but for the present decision they are not required.
We realize, as the Chancellor said (in his opinion on Jan's claim for compensation), that there is an implication in his main opinion that Jan owed a fiduciary duty to the heirs akin to that owed by a trustee or confidential agent. But that holding is not necessary to sustain his finding of title to the Leader shares. Accordingly, it is unnecessary for us to review it, and it is neither affirmed nor reversed.
It follows that the Chancellor's decision on the merits must be affirmed.

*524 Compensation to Jan Bata.
After the Chancellor had filed his opinion upon the merits, a hearing was held on the form of the final decree. It developed that Jan Bata asserted a right to establish an interest in or lien upon the Leader shares arising out of his services, or the services of his counsel with respect to such property.
Pursuant to the Chancellor's order, Jan on June 9, 1958, filed his claim. It recited the fact that after Thomas' death Jan, with the consent of the plaintiffs, had administered the business. It averred:
"Accepting, arguendo, for the purposes of this application, the determination herein made that defendant was not owner, defendant administered the enterprise above stated as its trustee". (Emphasis supplied.)
Jan prayed for an order awarding compensation for his services in respect of the property in suit as a condition to delivery of the property to the plaintiffs.
The right to compensation was challenged by the plaintiffs. The Chancellor, after a careful review of the matter, determined that Jan was entitled to compensation for his services to the enterprise. This holding was predicated like Jan's claim, upon the finding or assumption that Jan was a trustee or confidential agent, who had rendered the heirs outstanding services by the successful administration of the Bata enterprise.
However, the Chancellor conditioned the granting of leave to file the claim upon Jan's depositing with the Court his minority shares. The Chancellor said:
"I believe that the granting of permission to defendant to file his claim should be so conditioned that defendant will not possibly receive a duplicate benefit or, by retaining the property, maintain a position which is incompatible with his claim for compensation".
Jan, however, declined to deposit the shares, and on September 15, 1958, the Chancellor dismissed his claim.
We think that the claim was rightly dismissed, but we think that the dismissal should have been without prejudice for the following reasons:
The claim was predicated, as we have shown, upon the assumption that Jan's control of the enterprise, and his holding and control of the minority shares, were those of a quasi-trustee. The Chancellor's requirement for deposit of the minority shares was clearly predicated on the same assumption. But this is only an assumption. It is not to be regarded as settled notwithstanding the implication to that effect in the Chancellor's opinion in this case. Until it is settled, the right to compensation is not established.
Jan now claims to own the minority shares outright. He is entitled to litigate that claim. It is, of course, possible that he may establish it. If, after litigation, Jan emerges (for illustration) as a forty per cent owner of the whole enterprise, it might well be argued that he would be entitled to no compensation  or at least to an amount much smaller than that to which he would be entitled if he had no interest in the Bata enterprise. Even if compensation is allowable in the latter case, is it a matter for the Court of Chancery, or simply a claim at law against the Bata corporations or Leader?
Again, Jan might make good his claim as to some shares and fail as to others, because different results might be obtained in different jurisdictions.
We express no opinion upon any of these questions. We deal only with the timeliness of the claim. Since Jan was unwilling voluntarily to surrender all his minority shares (except the Dutch shares), and since the ownership of those shares *525 is not settled, we think his claim should have been dismissed without prejudice as premature. This leaves Jan free to make, in any future litigation, any contention he sees fit with respect to these minority shares, or with respect to his right to compensation.
One other point should be dealt with. The Chancellor required that Jan deposit the minority shares before the appeal was taken. It was urged below, and urged here, that it would have been sufficient to require the deposit after the decision in this Court (assuming an affirmance). This was obviously a matter within the Chancellor's discretion, and we decline to review his determination.

Allowance of Counsel Fees.
Jan also filed a claim for counsel fees. This claim was disallowed. The Chancellor, citing Maurer v. International Re-Insurance Co., 33 Del.Ch. 456, 95 A.2d 827, held that the application did not fall within any recognized exception to the general rule that a litigant must pay his own counsel fees. He analyzed the nature of the case and the proceedings before him and reached his conclusion upon reasoning that we think is entirely sound. Counsel argue here that he applied the law (the rule of the Maurer case) too rigidly, but we do not think so. It is unnecessary to discuss the matter further. We affirm his dismissal of the claim for counsel fees.

Conclusion.
An explanatory word must be said about this opinion. It has not been possible, without expanding it to intolerable length, to deal with all the subsidiary points and arguments contained in the 1,600 pages of briefs. Much is said (particularly by plaintiffs) about conflicts in the testimony and the credibility of witnesses. We have passed all this over, as the Chancellor did, in the interest of seeking to follow what we think to be applicable rules of law.
There is a great volume of evidence respecting the conduct of the parties during the war years, on which the briefs build many charges and counter-charges. The Chancellor's comment on this is very apt. He said:
"* * * much of the evidence of happenings during the war years confuses rather than assists in reaching the basic issue. It represents actions taken for a purpose (to avoid seizure as enemy property) which is not necessarily related to the dispute here". 139 A.2d 204.
The facts concerning the formation of Westhold and North River, the two Delaware holding companies, the peripatetics of the Leader certificates, the alleged conspiracy to secure control, and much other detail concerning the years just preceding the outbreak of litigation  all have seemed to us to have little relation to the main questions. We have not overlooked these matters, but we see no purpose in discussing them.
For the reasons stated in this opinion the final decree of the Chancellor of September 26, 1958, and the order of September 15, 1958, concerning claims, are affirmed; subject to the modifications necessary to conform such decree and order to that part of this opinion dealing with Jan Bata's claim for compensation; and the cause is hereby remanded to the Court of Chancery for New Castle County for the purpose of entering such modifications.