**SEMCO, INC., Plaintiff–Appellant,**

v.

**AMCAST, INC., Defendant–Appellee.**

**No. 94–3063.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 19, 1995.

Decided April 18, 1995.

---

Gary D. Greenwald (argued and briefed), Shayne & Greenwald, Anne Marie LaBue, Shayne & Greenwald, Columbus, OH, for plaintiff-appellant.

Joseph J. Golian (argued and briefed), Brenner, Brown, Comesfard & Goliau, Columbus, OH, for defendant-appellee.

Before: ENGEL, KENNEDY, and SUHRHEINRICH, Circuit Judges.

ENGEL, Circuit Judge.

The editor of DIE CASTING ENGINEER, a trade journal, asked John Kopp, the president of Amcast, to submit for publication an article on manufacturing beryllium-copper plunger tips ("BeCu tips"). Mr. Kopp submitted an article which the trade journal, after removing the more blatantly self-serving statements about Amcast products, published. Alleged misrepresentations of his own product by the president of Amcast created the underlying controversy which generated this lawsuit in the court below. Semco, a competitor of Amcast who claims to have been damaged, brought suit under the Lanham Act, 15 U.S.C. § 1125(a), and the Ohio Deceptive Trade Practices Act, O.R.C.

§ 4165.02, accusing Amcast of advertising certain Amcast products as meeting a standard which they did not in fact meet. After extensive discovery, Amcast moved for summary judgment. Semco responded in part that Amcast had not addressed all of the charges in Semco's complaint and, when Amcast denied that the additional claims had been made, requested permission to amend it to "clarify" these other claims. The district court granted Amcast's motion for summary judgment and denied Semco's motion to amend its complaint, holding that Semco had made no other charges and that it was too late to add them. Semco appeals the summary judgment, the denial of its motion to amend, and the district court's interpretation of its original complaint. We reverse and remand.

■ We review a summary judgment de novo, bearing in mind that "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

Semco and Amcast compete in manufacturing and selling plunger tips made of beryllium-copper for use in the aluminum die cast industry. The highest grade tips contain between 1.9% and 2.15% beryllium and are called "Be–20," "BeCu 20" or "# 20" tips. Semco produces these high quality tips, which are harder and longer lasting than tips containing less beryllium. Amcast offers a plunger tip called the "Am20" for about half the price of a Semco BeCu 20 tip, but Amcast's tips do not contain between 1.9% and 2.15% beryllium. Semco complains that Amcast nonetheless misrepresents its Am20 tip as a BeCu 20 tip.

Semco bases its suit primarily upon alleged misrepresentations in the article, which Semco characterizes as advertising. The editor of DIE CASTING ENGINEER asked Kopp, the president of Amcast, to write an article explaining a new method developed and used by Amcast for manufacturing plunger tips. Kopp responded with a proposed article promoting Amcast by briefly describing the manufacturing process, then going on to de-

tail Amcast's history and commitment to its customers and generally to praise Amcast and its products. After removing specific references to individual Amcast products, the magazine published the Amcast article in its January/February, 1989 issue. In the article, Kopp states that he recommends BeCu 20 tips to his customers over tips made with less beryllium, he explains why the BeCu 20 tips are better, and he announces that Amcast uses "beryllium and copper supplied by either Brush Wellman or NGK Metals," two reputable sources for virgin beryllium and copper.

After DIE CASTING ENGINEER published the article, Amcast obtained reprints, made numerous copies, and used the article as a promotional brochure at trade shows. Amcast salesmen also recommended the BeCu 20 plunger tip, told customers that Amcast offered a BeCu 20 tip, and filled orders for such tips with the Am20. Semco offers to prove both that the Am20 does not contain sufficient beryllium to meet the standard for a BeCu 20 tip and that Amcast uses scrap, previously used beryllium, rather than virgin beryllium from Brush Wellman or NGK Metals. Semco originally filed suit in Ohio state court, but it voluntarily dismissed its complaint to file in federal district court. That court had both federal question jurisdiction under the Lanham Act and diversity jurisdiction.

## I. The Lanham Act

■ The district court held that Semco's complaint alleged misrepresentations only in the article published in DIE CASTING ENGINEER and that, so restricted, the complaint did not state a claim of action under the Lanham Act. Section 43(a) of the Lanham Act provides:

(a)(1) Any person who ... uses in commerce ... any ... false or misleading description of fact, or false or misleading representation of fact, which—

. . . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographical ori-

gin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added). The district court ruled and Amcast argues that the article written by Amcast's president did not constitute "commercial advertising or promotion," so Amcast did not violate the Lanham Act.

The Lanham Act does not define this critical phrase, and unfortunately, the legislative history of the Trademark Law Revision Act indicates that the House of Representatives and the Senate interpreted the phrase differently. The House apparently intended to limit the application of the Lanham Act strictly to "commercial speech," as that phrase has been defined in the constitutional jurisprudence of the Supreme Court. "Commercial speech" receives much narrower First Amendment protection than other speech, and the Constitution does not protect deceptive or misleading commercial speech. The House, by so restricting the section, intended to guarantee the constitutionality of the Lanham Act.

To avoid legitimate constitutional challenge, it was necessary to carefully limit the reach of the subsection. Because section 43(a) will no[w] provide a kind of commercial defamation action, the reach of the section specifically extends only to false and misleading speech that is encompassed within the "commercial speech" doctrine by the United States Supreme Court.

134 Cong.Rec. H 10420 (daily ed. October 19, 1988) (Rep. Kastenmeier). The Senate, however, interpreted the First Amendment more narrowly and accordingly envisioned a greater scope for § 43(a).

[T]he word "commercial" is intended only to eliminate any possibility that the section might be applied to political speech. Although the Senate sees this language as unnecessary because section 43(a) requires that the misrepresentations be made with respect to goods or services, we consider inclusion of the language so long as Congress' intent that it be interpreted only as

excluding political speech is clear. It is also Congress' intent that the "commercial" language be applicable any time there is a misrepresentation relating to goods or services.

134 Cong.Rec. S 16973 (daily ed. October 20, 1988) (Sen. DeConcini).

We shrink from attempting to divine the true meaning of "commercial advertising and promotion" because of the contradictory legislative history concerning that language. In any event, Amcast's alleged misrepresentations fit either definition. Since the article written by Amcast's president is not political, it easily meets the Senate description. It is more difficult, however, to apply the House definition. The Supreme Court itself "recognize[s] the difficulty in making a determination that speech is either 'commercial' or 'noncommercial.'" *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 539, 101 S.Ct. 2882, 2908, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring).

The Court has developed the category of "commercial speech" over a period of years and in quite a different context, in cases when a would-be advertiser challenged a state or federal law which, unlike the Lanham Act, prohibited its truthful advertisements. The core definition of "commercial speech" is that speech "which does 'no more than propose a commercial transaction.'" *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973)). Although Mr. Kopp's article does more than merely "propose a commercial transaction" and thus may not meet a core definition of "commercial speech," the Supreme Court has extended the category to include speech similar to the article.

■ Speech need not closely resemble a typical advertisement to be commercial. In *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), a manufacturer of contraceptives challenged a federal law prohibiting—with criminal and civil penalties—the mailing of any unsolicited advertising relating to contracep-

tion. The advertisements in question varied, but included several informational pamphlets concerning condoms and sexually transmitted diseases, one "without any specific reference to those [condoms] manufactured by [Youngs]. The only reference to [Youngs'] products is contained at the very bottom of the last page, where [Youngs] is identified as the distributor of Trojan-brand prophylactics." 463 U.S. at 67, n. 13, 103 S.Ct. at 2880, n. 13. This pamphlet bears a remarkable similarity to the Kopp article, which discussed BeCu plunger tips in considerable detail, although the text of the article was far more specific to Amcast than the pamphlet was to Youngs. The Court decided that the pamphlet's lack of specificity did not render it noncommercial. "That a product is referred to generically does not, however, remove it from the realm of commercial speech. For example, a company with sufficient control of the market for a product may be able to promote the product without reference to its own brand names." *Id.*

The Court then used all of the pamphlets' characteristics as cumulative evidence of their commercial nature.

> The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech.... Similarly, the reference to a specific product does not by itself render the pamphlets commercial speech.... Finally, the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech....
>
> The combination of all these characteristics, however, provides strong support for the ... conclusion that the informational pamphlets are properly characterized as commercial speech.

463 U.S. at 66–67, 103 S.Ct. at 2880 (citations and footnotes omitted). Here, Amcast does not admit that the Kopp article advertises for Amcast, but the article does refer generally to Amcast products, and a rational jury could easily find that Amcast had an economic motivation for submitting the article through

its president. A company's admission that the speech in question is advertising may strongly indicate that it is commercial, but the company's refusal to admit that does not convince us that it is not commercial speech. Only this item from the *Bolger* list is missing here, and the *Bolger* Court did not require each element: "Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial." 463 U.S. at 68, n. 14, 103 S.Ct. at 2880–81, n. 14.

The district court in this case viewed the Kopp article as more article than advertisement, but we cannot ignore the promotions of Amcast, also evident in the article, which do not contribute to its intellectual or technical value. There is no question that Kopp could have submitted an article which did not contain commercial speech—in fact, Kopp could have written precisely what the editor requested, a detailed description and explanation of the new process for manufacturing plunger tips. Instead, Kopp presented an article peppered with advertising for Amcast—and that advertising, which the trade publication did not solicit, allegedly contained material misrepresentations of Amcast products. The Supreme Court has repeatedly "made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech.... Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Bolger*, 463 U.S. at 68, 103 S.Ct. at 2881 (citations omitted).

Similarly, in *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), a company challenged a SUNY rule prohibiting private commercial enterprises from operating on campus. The company wished to hold "Tupperware parties" in dormitories, at which the company would both sell its products and discuss such subjects as financial responsibility and how to run an efficient home. The Court determined that these "parties" presented commercial speech despite the inclusion of noncommercial speech.

[T]here is nothing whatever "inextricable" about the noncommercial aspects of these presentations. No law of man or nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares. Nothing in the [rule] prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages. Including these home economics elements no more converted AFS' presentations into educational speech, than opening sales presentations with a prayer or a Pledge of Allegiance would convert them into religious or political speech.

492 U.S. at 474–75, 109 S.Ct. at 3031–32. Likewise, "no law of man or nature makes it impossible" to explain the new process for manufacturing plunger tips without describing Amcast's own products, history, quality standards, safety standards, and commitment to customer service. Such additions promote Amcast and invite commercial transactions, and they represent commercial speech.

■ The district court also emphasized the fact that Amcast did not pay for publication of the article, but wrote it at the request of the editor of DIE CASTING ENGINEER. Nonetheless, it is not difficult to infer a consideration or a *quid pro quo* in circumstances such as this: procurement of material for a publication in exchange for advertising the author's product. Neither the Lanham Act nor any Supreme Court precedent requires that consideration be paid for something to constitute advertising. In *Fox*, the Tupperware case, the plaintiffs included the company and several students, who wished to host or to attend the Tupperware parties. Nothing indicates that the company would have been required to pay anything to make its presentation, which was invited by the students much as the editor of DIE CASTING ENGINEER invited the Kopp article. We note that neither DIE CASTING ENGINEER nor its editor could be held liable under the Lanham Act. We see no reason, however, why Amcast should not be liable for its own misrepresentations, even though it was not required to

pay for their publication. New products or techniques may often be newsworthy, but that status does not permit their manufacturers to lie. The phrase "free advertising," far from being an oxymoron, aptly describes the publicity manufacturers may receive in press releases, news interviews, or trade publications. The Lanham Act does not prohibit or hamper such advertising; it requires only that manufacturers describe their products truthfully.

Therefore, we hold that the alleged misrepresentations contained in the Kopp article represent commercial speech and are actionable under the Lanham Act.

## II. Motion to Amend the Complaint

 The district court held that Semco's complaint charged only that the Kopp article contained misrepresentations, despite Semco's claim that the complaint also addressed other instances of alleged misrepresentation, including Amcast's use of article reprints at trade shows and Amcast's individual assertions to customers that the Am20 met or exceeded the industry standard for BeCu 20 plunger tips. Semco argues that even if the complaint failed to allege other violations of the Lanham Act, Semco should be permitted to amend the complaint so that it does. The district court has broad discretion to permit or to deny a motion to amend, see *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), although "leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). Semco amended its state-court complaint twice before dismissing it and filing in federal court, so it had ample opportunity to refine and restate the complaint. Semco moved to amend its complaint a mere month before trial, after extensive discovery had been conducted. Given the tardiness of Semco's motion and the likelihood of prejudice to Amcast if the motion were allowed, the district court did not abuse its discretion by denying Semco's motion to amend its complaint. This is not to suggest that the trial judge should or should not permit any amendment upon remand.

Semco also argues that its original complaint covered the claims it wished to add. The federal rules provide that "All pleadings shall be so construed as to do substantial justice." F.R.Civ.P. 8(f). Thus, despite affirming the denial of Semco's motion to amend, we must determine whether the district court properly construed Semco's ambiguous complaint. We find that the district judge interpreted the complaint in an unduly restrictive manner.

 Semco clearly stated in its complaint as filed in the district court that "Amcast has used reprints of the article as a sales, marketing and promotional tool to represent to prospective purchasers of plunger tips that the plunger tips manufactured by Amcast are manufactured pursuant to the BeCu–20 alloy standard applicable in the industry." Complaint ¶ 11. The district court did not mention this count when it granted Amcast's motion for summary judgment. Even if, as the district court held, the Lanham Act had not applied to the article itself as published, the Act certainly covers Amcast's use of the reprint as advertising at trade shows. Semco merits a trial on this count, as well as on the article as published.

 The trial court also failed to mention another important phrase in the complaint, which stated: "Amcast has continued to solicit and receive orders from customers requesting Amcast to supply plunger tips manufactured pursuant to the BeCu–20 alloy standard." Complaint ¶ 13. The district court ignored the mention of Amcast's solicitation and described paragraph 13 as "relating to how defendant responded to certain purchase orders." While Semco might have drafted this paragraph more clearly, the original language, if construed "so as to do substantial justice," does allege that Amcast solicited orders for BeCu–20 tips, thereby representing that Amcast manufactured tips meeting this standard. Similarly, Semco claims that Amcast responded to customers' inquiries by misrepresenting its products. While the district court correctly states that simply accepting an order for BeCu–20 plunger tips does not constitute "commercial advertising or promotion" under the Lanham Act, the other acts alleged by Semco do state a claim of which Amcast had adequate notice. The element of surprise, let alone unfair surprise, is altogether lacking.

■] Likewise, Amcast had sufficient notice of Semco's assertion that the term "BeCu 20" represented an industry standard requiring between 1.9% and 2.15% beryllium content. Although the complaint does not actually allege this fact, the suit depends upon this standard. No defendant could have remained unaware of its importance, since Semco repeatedly alleges that Amcast's plunger tips fail to meet the standard. We see no reason to penalize Semco for its failure to state the standard itself explicitly in its complaint.

However, even Semco admitted that "the original complaint 'seems to limit Semco's claims to those sales and promotional activities occurring after publication of the article'" in early 1989. Nothing in the complaint mentions any occurrence before the publication of the article, and even construed liberally, the complaint does not allege earlier misrepresentations. Accordingly, we reverse and remand for trial limited to Semco's claims of misrepresentations occurring in 1989 or later, in the Kopp article itself, in Amcast's use of reprints of the article, and by Amcast or its representatives to customers. The admissibility of facts occurring prior to 1989, however, is an evidentiary question for the trial court.

### III. The ODTPA

The district court noted in a footnote that "Both parties have agreed that the analysis under the Ohio Deceptive Trade Practices Act is the same as that under § 43(a)." Semco argues now that while one section of the ODTPA should be interpreted the same way as the Lanham Act, the entire ODTPA is broader than the Lanham Act, and therefore the Kopp article could be actionable under the ODTPA even if it is not "commercial advertising or promotion" under the Lanham Act. Since we have held that misrepresentations in the article and elsewhere are actionable under the Lanham Act, we need not address this issue.

For the reasons stated above, we REVERSE the summary judgment in favor of Amcast and REMAND to the district court for further proceedings consistent with this opinion.