GORDON AND BREACH SCIENCE PUBLISHERS S.A., STBS, Ltd., and Harwood Academic Publishers GMBH, Plaintiffs,

v.

AMERICAN INSTITUTE OF PHYSICS and American Physical Society, Defendants.

No. 93 Civ. 6656 (LBS).

United States District Court, S.D. New York.

Nov. 2, 1995.

Orans, Elsen & Lupert, New York City, for Plaintiffs (Sheldon H. Elsen, Leslie A. Lupert, and Amelia A. Nickles, of counsel).

Covington & Burling, Washington, D.C., for Defendants (Richard A. Meserve and Philipp U. Tamussino, of counsel).

## OPINION

SAND, District Judge.

This action, part of an ongoing dispute between publishers of scientific journals, explores the reach of the Lanham Act's false-advertising provision, Section 43(a), 15 U.S.C. § 1125(a) (amended 1992), specifically its application to a publisher's dissemination of a comparative survey of scientific journals, which, through the employment of an allegedly misleading rating system, rates the publisher's own journals as superior. In an earlier decision in this case, *Gordon and Breach Science Publishers S.A. v. American Institute of Physics*, 859 F.Supp. 1521 (S.D.N.Y. 1994), this Court found that the actual publishing of the survey, in two of the non-profit publisher's scientific journals, did not come within the Lanham Act, as the articles encompassing the survey did not constitute "commercial advertising or promotion" pursuant to Section 43(a).

Plaintiffs Gordon and Breach Science Publishers S.A., STBS, Ltd., and Harwood Academic Publishers GMBH (collectively, "G & B") are part of an international group of publishers that publish and distribute a wide range of technical, scientific, medical, commercial and business journals and books. Defendants the American Institute of Physics ("AIP") and the American Physical Society ("APS") are non-profit physics societies; they publish physics journals that share a readership with some of the for-profit journals published by G & B.

G & B commenced this action after articles comparing scientific journals by price and value appeared in 1986 and 1988 in two publications published by AIP and APS, *Physics Today* and the *Bulletin of the American Physical Society* ("Barschall articles" or "Barschall surveys"). The articles, by Henry Barschall, a physics professor and APS officer, ranked selected journals in terms of "cost-effectiveness" (based on the journals' price per thousand characters) and "impact" (based on the frequency with which each journal has been cited in the academic literature). As it happened, journals published by AIP and APS scored near the top in the articles' rankings, and several of G & B's journals were ranked at or near the bottom.

Defendants, pleased with the survey results, naturally sought to share the good news with interested society members—principally physicists—and both current and potential future subscribers—primarily librarians. The dissemination of Barschall's favorable findings took a variety of forms, namely: (1) the distribution of prepublication copies of the 1988 survey results to librarians at a conference in June 1988; (2) presentations of the survey results in November 1988, November 1991, and May 1992 by Harry Lustig, a senior officer of APS, to physicists and librarians; (3) specific references to the 1986 article at a conference of librarians in June 1987 and to the 1988 article at a similar symposium in June 1989; (4) numerous mailings throughout 1987, 1988, and 1989, some of which were merely planned but never effectuated, to members and librarians, in the United States and abroad; the mailings consisted of letters containing promotional references to, and often accompanied by reprints of, the most recent Barschall survey; and (5) advertisements for APS journals, describing the journals in such terms as "the most cost-effective."

Concluding that the articles themselves were more informational than purely commercial,[1] this Court, by decision dated August 15, 1994, granted defendants' motion to dismiss the claims arising from the publishing of the articles, but denied defendants' motion to dismiss all claims related to the subsequent uses of the survey results. Bifurcating discovery, the Court limited it in the first instance to those matters that relat-

---

1. In this Court's earlier ruling, we held that New York's six-year statute of limitations, the period for fraud actions, barred plaintiffs' claims arising from the 1986 articles. *Gordon and Breach*, 859 F.Supp. at 1528–30. The Court's substantive ruling thus concerned only the 1988 articles.

ed to the extent of defendants' contacts with librarians and other prospective purchasers of their journals (the "secondary uses"), in particular whether those contacts were extensive enough to constitute "commercial advertising or promotion" under the Lanham Act.

Having undertaken such discovery, plaintiffs now move for an order vacating the Court's earlier dismissal of part of the complaint, under Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 60(b)(2), and granting plaintiffs leave to amend the complaint, pursuant to Fed.R.Civ.P. 15. Plaintiffs move on the grounds that extensive discovery has yielded new evidence revealing close interaction between Barschall and several senior APS and AIP officers—information previously unknown to plaintiffs and to the Court. Defendants cross-move for summary judgment on two grounds: (1) that final judgments rendered in this matter in Germany and Switzerland preclude plaintiffs from relitigating their claims in this Court; and (2) that the secondary uses are not commercial speech. The Court heard oral argument on June 26, 1995. We now deny plaintiffs' motion and grant defendants' motion in part and deny such motion in part.

## FACTUAL BACKGROUND

For a more complete and detailed exposition of the material facts in this action, we direct the reader to the Court's earlier decision, *Gordon and Breach*, 859 F.Supp. 1521, 1524–27. A brief rendition of the pertinent facts alleged in plaintiffs' complaint and plaintiffs' and defendants' respective memoranda and affidavits, as supported, where relevant, by the accompanying exhibits, follows.

Gordon and Breach Science Publishers S.A. and Harwood Academic Publishers GMBH are Swiss corporations; STBS, Ltd. is a corporation organized and existing pursuant to the laws of England. Together, plaintiffs ("G & B") publish approximately 200 journals in various scholarly disciplines. Subscribers include university and corporate libraries. AIP is a non-profit New York corporation whose members consist of scientific societies in the field of physics and as-

tronomy. APS, a member society of AIP, is a non-profit corporation organized under District of Columbia law with over 43,000 scientist members worldwide. Both AIP and APS publish scientific journals; AIP also assists in publishing the journals of its member societies, including APS. The primary purchasers of defendants' journals include many of the same university libraries that purchase plaintiffs' publications.

AIP, alone and in conjunction with its member societies, publishes approximately 35 scientific journals, distributed to approximately 195,000 subscribers. These journals include the *Bulletin of the American Physical Society,* an APS publication, and *Physics Today,* a monthly magazine distributed free to the more than 100,000 members of AIP's member societies, giving it a readership that is the largest of any physics publication. In 1991, AIP claimed revenues from publishing of over $31 million. G & B contends that AIP and APS compete directly with G & B for subscribers as well as for editors and contributors of articles.

The first Barschall article, entitled "The Cost of Physics Journals," appeared in the December 1986 edition of *Physics Today.* Compl.Ex. A. Professor Barschall developed his survey of the prices of physics and philosophy journals on the basis of a cost-per-thousand characters figure. He reproduced partial results of the cost survey in tabular form, listing one or two physics publications of each of the major publishers. The two journals published by G & B were ranked as the most expensive in their respective categories (physics and mathematics), while the four journals published by AIP and APS were at the top of the physics category with the lowest cost per thousand characters.

In 1988 Barschall conducted an expanded survey of journal costs, which he published in full in the *Bulletin of the American Physical Society,* Compl.Ex. C, and in abbreviated form in the July 1988 edition of the *Physics Today* magazine, as part of an article entitled "The Cost–Effectiveness of Physics Journals," Compl.Ex. B; Pls.' Ex. 37. In the new survey, Barschall not only prepared a cost-per-thousand characters analysis, but also conducted an analysis of the periodicals' com-

parative "impact." He derived the "impact" figure from the number of times the journals' 1984 and 1985 articles were cited in the 1986 *Scientific Citation Index.* Barschall combined the cost and impact factors to produce a "cost/impact ratio," which he described as "perhaps the best indicator of a journal's cost-effectiveness." Compl.Ex. B at 56; Pls.' Ex. 37 at 56.

Several patterns emerged from the 1988 survey, in particular one on which G & B focuses: All the publishers with low average costs per character and low cost/impact ratios were non-profit scientific societies, while those with high costs and ratios were commercial publishing houses. *Id.* at 57. Specifically, as detailed in the two tables summarizing the results, AIP or APS ranked either first—in all eight categories of Table 1—or near the top, while G & B ranked last in all the areas where its journals were listed. *Id.* at 58–59. The article concluded with the recommendation:

> There is no simple solution, but authors can help physics libraries by publishing their papers in journals that have a low cost per character. In general, articles in such journals also have a greater "impact," so that authors too will benefit by publishing in them.

*Id.* at 59.

G & B contends that the articles were fundamentally misleading, both in their essential premise and in their execution, and accordingly took several responsive steps.

Gordon and Breach Science Publishers S.A. ("Gordon and Breach") filed two unfair competition suits in Switzerland, one against Professor Barschall in the Zurich District Court (*Bezirksgericht Zurich*) and a parallel action against AIP and APS in the Zurich Commercial Court (*Handelsgericht Zurich*). The Barschall suit resulted in a judgment, rendered on October 23, 1992, largely favorable to Professor Barschall, Defs.' Ex. 3; both sides appealed to the Zurich Court of Appeal (*Obergericht Zurich*), which on July 9, 1993, affirmed in part and modified in part the lower court decision, Defs.' Ex. 4. In the action against AIP and APS, the Commercial Court, by decision rendered September 19, 1993, rejected Gordon and Breach's claims

and upon remand on a minor point from the Zurich Court of Cassation (*Kassationgericht Zurich*), affirmed its initial ruling on December 19, 1994, Defs.' Ex. 5.

Gordon and Breach also filed suit against Barschall, AIP, and APS in Germany before the Frankfurt District Court (*Landgericht Frankfurt*), which ruled on May 30, 1990, that the articles were not deceptive and did not violate the German Law against Unfair Competition. The Frankfurt Court of Appeals (*Oberlandesgericht Frankfurt*) on October 25, 1990, affirmed the lower court decision, Defs.' Ex. 1; upon further appeal, the German Federal Court of Justice (*Bundesgerichtshof*) on November 21, 1991, declined to entertain the action, Defs.' Ex. 2.

Gordon & Breach, Harwood Academic Publishers GMBH ("Harwood"), and STBS, Ltd. ("STBS") all brought an action in France against Barschall, AIP, and APS. The suit resulted in a judgment, rendered November 27, 1991, by the High Court of Paris (*Tribunal de Grande Instance de Paris*), which concluded that under French law there had been acts of unlawful comparative advertising by defendants. On May 11, 1994, the French Court of Appeals (*Cour d'Appel de Paris*) entered a judgment that reformed the lower court decision in so far as the appellate court found United States rather than French law to be solely applicable to the issues raised and consequently stayed the lower court ruling pending conclusive determination of the matter in the Federal District Court for the Southern District of New York, where G & B had filed suit on September 23, 1993.

Meanwhile, this Court, by decision rendered August 15, 1994, granted in part and denied in part defendants' motion to dismiss. We found that the Barschall articles did not constitute "commercial advertising or promotion" within section 43(a) of the Lanham Act and thus were fully protected by the First Amendment. We held, however, that certain of the uses to which defendants had put the articles—their dissemination of the survey results to librarians—fell squarely within section 43(a)'s ambit, and the Court accordingly limited subsequent discovery to

matters relating to these and other such secondary uses. Specifically, we restricted discovery "to those matters which relate to the extent of defendants' relevant contacts with librarians and other prospective purchasers of their publications." *Gordon and Breach,* 859 F.Supp. at 1545.

This discovery began in mid-October 1994, when defendants delivered to attorneys for plaintiffs approximately five thousand pages of documents relating to secondary use. Plaintiffs argue, Plaintiffs' Statement of Material Facts as to Which There are Genuine Issues to be Tried at 2, that the following events "constitute[ ] ... instance[s] of 'secondary use' by defendants of the Barschall surveys for promotional purposes":

*Preprints*

At a conference of the Special Libraries Association ("SLA") in Denver, Colorado, on June 11–16, 1988, Jeff Howitt, the head of marketing at AIP, distributed prepublication copies ("preprints") of the survey results to librarians. Pls.' Ex. 23.

*Lustig Presentations*

In November 1988, Harry Lustig ("Lustig"), a senior officer of APS, presented the survey results to physicists at the City College of New York. In November 1991, Lustig gave a similar presentation to Ann Okerson of the Association of Research Librarians ("ARL"), an organization of about 120 of the largest research libraries in this country, and other senior librarians, during which he displayed slides with tables from the survey. *See* Pls.Ex. 52, p. 2 (December 16, 1991, cover letter to APS Publication Policy Task Force, enclosing Lustig's December 18, 1991, report on meeting with senior librarians). In May 1992, Lustig presented Barschall's results to a group at an ARL convention, again showing slides of the relevant tables. *See* Pls.' Ex. 53, p. APS003458–62 (Memo to Lustig from Mona of APS enclosing outline and transparencies of Lustig's May 1992 talk at ARL convention).

*SLA Conventions*

At the SLA convention's Physics Workshop on June 10, 1987, Rita Lerner, Manager of Marketing Services at AIP, made reference to the 1986 Barschall article, and at the June 1989 workshop, whose panel included Robert Baensch, AIP's Director of Publishing, the moderator referred to the 1988 survey results.

*Mailings*

Defendants sent two mass distributions of reprints of the 1986 article with cover letters, dated August 1987 and September 1987 and respectively signed by Lustig and David Lazarus ("Lazarus"), both senior officers of APS, Pls.' Ex. 21, and Robert Marks, Director of Publishing at AIP, Pls.' Ex. 22, to all library subscribers of APS' journals. Another mass mailing to all members occurred the following year, via a promotional letter dated May 1988, signed by then-APS president Val Fitch ("Fitch"), referring explicitly to the 1988 survey results. Pls.' Ex. 43. On August 30, 1988, William Havens ("Havens") of APS signed a letter subsequently sent to Claude Piketty in which he mentioned the 1988 Barschall article, Pls.' Ex. 47; defendants mailed similar letters to roughly ten APS members in France.

In September 1988 Havens, Lazarus, and Lustig signed a cover letter, to accompany a mass mailing of reprints of the 1988 survey, Pls.' Ex. 45; it is not settled whether this mailing actually occurred or was merely planned.[2] *See* Memorandum in Opposition to Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 60(b) and 15 and in Support of Defendants' Cross–Motion for Summary Judgment ("Defs.' Opp'n & Cr–Mot.") at 29 n. 26; Memorandum in Further Support of Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 60(b) and 15 and in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Reply &

---

2. On a motion for summary judgment, we must view the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 2076–77, 119 L.Ed.2d 265 (1992); *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). In this case, defendants have moved for summary judgment. We accordingly resolve all factual ambiguities against them and thus assume that the disputed September 1988 mailings were indeed sent.

Opp'n") at 27 n. 12; Memorandum in Further Opposition to Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 60(b) and 15 and in Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defs.' Surreply & Reply") at 24, 35; Surreply in Further Support of Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 60(b) and 15 and in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Surreply") at 7–8 n. 6.

Defendants also mailed a letter dated September 20, 1988, to Japanese non-member subscribers, citing Barschall's 1988 survey. *See* Pls.' Ex. 19, p. BAR00464–65 (Minutes from APS Publications Committee Meeting September 16, 1988, referring to Japanese mailing); Pls.' Ex. 46, p. APS004818 (September 20, 1988, Editor-in-Chief's Report by David Lazarus, referring to Japanese mailing). A promotional cover letter, to accompany a mass distribution of reprints of the 1988 article, signed by Jeff Howitt and dated simply 1988, was never mailed, Pls.' Ex. 60; a promotional mass mailing scheduled for September 1989 was also never sent. Plaintiffs claim that defendants' decision not to send these items was made as a direct result of complaints by G & B and G & B's subsequent filing of the lawsuit in Switzerland. Memorandum in Support of Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 60(b) and 15 ("Pls.' Mot.") at 40–42. Finally, APS mailed a cover letter dated December 27, 1989, and signed by Paul Parisi of APS, with reprints of the 1988 survey, to Mandy Cozier, the librarian for Blackwell's in Oxford, England. Pls.' Ex. 54.

*Advertisements*

Barbara Meyers of APS prepared an advertisement for APS journals, which appeared in the EBSCO Handbook for Libraries and which described the APS publications as having "the most cost-effective prices in the world" and "subscription prices as low as possible." Pls.' Ex. 56. AIP also ran advertisements in various subscription agents' catalogues, with language similar to the APS advertisement.

G & B alleges that these secondary uses constitute "overwhelming evidence that the Barschall surveys were used to market and promote defendants' journals" and thus form the basis for an unfair competition claim under the Lanham Act. Memorandum in Support of Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 60(b) and 15 ("Pls.' Mot.") at 3. Plaintiffs also contend that the recent discovery of documents and depositions has revealed a close and heretofore unknown interaction between Professor Barschall and APS and AIP officers in drafting and promoting the use of the 1988 survey; this cozy working relationship, plaintiffs argue, casts new light on the nature of the articles themselves and their classification as non-commercial speech. On the basis of this "new evidence," G & B seeks to vacate the Court's dismissal of part of the complaint, under Fed.R.Civ.P. 60(b), and to amend the complaint, pursuant to Fed.R.Civ.P. 15, so that plaintiffs can present these newly discovered facts.

For their part, AIP and APS seek summary judgment. Defendants base their motion on the collateral-estoppel effect of the Swiss and German judgments, decided in favor of defendants on the bottom-line issue of whether the articles were deceptive or misleading, and on the inadequacy of plaintiffs' evidence regarding the secondary uses of the articles.

## DISCUSSION

At the heart of this action is section 43(a) of the Lanham Act, as amended in 1988 and 1992, which reads in pertinent part:

(1) Any person who, on or in connection with any goods or services, ... uses in commerce any ... false or misleading representation of fact, which—

.　　.　　.　　.　　.

(B) in commercial advertising or promotion, misrepresents the nature ... of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 43(a); 15 U.S.C. § 1125(a). The principal issue before the Court is whether the secondary uses of the Barschall articles are sufficiently promotional in nature to con-

stitute "commercial advertising or promotion."

*Standard on a Motion for Summary Judgment*

■ Summary judgment is appropriate where there is "no genuine issue as to any material fact," so that the moving party is entitled to "judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. *Coach Leatherware Co. v. Ann-Taylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991). In determining whether to grant a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. 242 at 249, 106 S.Ct. 2505 at 2511.

■ The moving party bears the initial burden of establishing the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, if the non-moving party would bear the burden of proof on a claim at trial—as plaintiffs would in this case—the movant may satisfy its burden by demonstrating an absence of evidence to support an essential element of such a claim. *Id.* at 325, 106 S.Ct. at 2553–54. To defeat the motion, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), but instead must point to evidence sufficient to establish each element of its case, *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552—evidence, that is, such that a reasonable jury could return a verdict for the non-moving party on that element. *Liberty Lobby*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir.1992).

## I. *Fed.R.Civ.P. 60(b) and 15*

G & B seeks to vacate, pursuant to Fed.R.Civ.P. 60(b), the Court's ruling as to the noncommercial nature of the articles them-

selves. 60(b) provides in pertinent part, "[T]he court may relieve a party or a party's legal representative from a final judgment, order, or proceeding ..." Fed.R.Civ.P. 60(b). The Rule goes on to list "newly discovered evidence" as one of the possible bases on which to vacate a final order. Cases and commentators have interpreted this requirement strictly, noting that the new evidence "must be such that it would have changed the result of the earlier judgment." *Bakula v. Dufaur Corp.*, No. 92 Civ. 5166, 1994 WL 18503 (S.D.N.Y. Jan. 18, 1994); *see United States v. All Right, Title and Interest in Property and Premises Known as 710 Main Street*, 753 F.Supp. 121, 126 (S.D.N.Y.1990); 11 Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2808, at 86–94, § 2859, at 301–10 (1995); *see also Mendell v. Gollust*, 909 F.2d 724, 731–32 (2d Cir.1990), *aff'd*, 501 U.S. 115, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991) (denying Rule 60(b) motion for want of "exceptional circumstances").

■ Defendants argue that the Court's August 15, 1994, ruling does not represent a "final judgment, order, or proceeding" under Rule 60(b), and we agree. An order is considered "final" under Rule 60(b) only when it terminates the litigation. *Cohn v. United States*, 259 F.2d 371, 376 (6th Cir.1958). For both appellate and res judicata purposes, contexts analogous to Rule 60(b), the determination of "finality" likewise turns on whether the judgment has disposed of all the claims in the complaint. *See McCowan v. Dean Witter Reynolds, Inc.*, 889 F.2d 451, 452–53 (2d Cir.1989) (appealability); *Sherman v. Jacobson*, 247 F.Supp. 261, 269 (S.D.N.Y.1965) (res judicata). As our decision explicitly left open all claims relating to the secondary uses of the Barschall articles, it therefore is not a "final judgment."

■ Plaintiffs alternatively contend that if the Court's order is not final as a matter of law, the Court's power to amend is even less restricted than if the ruling were considered final. A district court has the inherent authority to reconsider and modify its interloc-

utory orders.[3] *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Uccio*, 940 F.2d at 757; *Cohn*, 259 F.2d at 376; *Krome v. Merrill Lynch & Co., Inc.*, 110 F.R.D. 693, 694 (S.D.N.Y.1986); *Sherman*, 247 F.Supp. at 269 (citations omitted). A court may grant leave to amend "when it is consonant with justice to do so." *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir.1982), *cert. denied sub nom. Errante v. U.S.*, 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); *see* Fed.R.Civ.P. 15(a) ("leave shall be freely given when justice so requires.").

■ The situation before us is one where it is plainly *inconsonant* with justice to grant plaintiffs' requested relief. First, the "new evidence" plaintiffs claim to have found is precisely what the Court's prior opinion sought to preclude. To avoid the possible chilling effect of limitless discovery in this context—the fear that non-profit journals would not be able to publish academic surveys favorable to them, secure in the knowledge that they could do so without incurring litigation—we mandated a *prima facie* showing of "commercial advertising or promotion." *Gordon and Breach*, 859 F.Supp. at 1541–43. Plaintiffs failed to make that showing and now seek back-door entry to revisit the issue, after undertaking the exact discovery that the Court cautioned against in the first instance. Plaintiffs claim that by

virtue of the fact that discovery has indicated that the secondary uses were even greater than had previously appeared, the publication itself is subject once again to suit.[4] Mischaracterizing this admittedly "*new* proof"—obtained "*after* discovery"—as "establish[ing] a *prima facie* case that the surveys constitute commercial, and not academic speech ...," Pls.' Reply & Opp'n at 4, 14, plaintiffs seek impermissibly to expand the scope of the exploitative uses.[5]

Second, although we held previously that defendants' intent was not dispositive, plaintiffs proffer their new and conclusive evidence as probative of defendants' intent in publishing the surveys. But this proof would not have changed the result of our original ruling; "The fact that AIP and APS stood to benefit from publishing Barschall's results—even that they *intended* to benefit—is insufficient by itself to turn the articles into commercial speech." *Gordon and Breach*, 859 F.Supp. at 1541 (citations omitted).[6]

## II. *Collateral Estoppel*

■ AIP and APS contend that plaintiffs are collaterally estopped from pursuing this litigation on account of the judgments rendered against Gordon and Breach in Switzerland and Germany. It is well-established that United States courts are not *obliged* to recognize judgments rendered by a foreign state, but may *choose* to give res judicata

**3.** The law-of-the-case doctrine, which defendants argue bars reconsideration of interlocutory rulings, is a flexible standard not a fixed rule. *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991); *Slotkin v. Citizens Casualty Co. of New York*, 614 F.2d 301, 312 (2d Cir.1979), *cert. denied*, 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980).

**4.** In support of their position, plaintiffs rely heavily on *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108 (6th Cir.1995), a Lanham Act case similar on its facts to the instant matter. In *Semco*, the president of Amcast wrote a misleading article, published in an engineering journal, detailing Amcast's new manufacturing process for beryllium-copper plunger tips and touting Amcast's history of product excellence and customer service. The Sixth Circuit found that the article constituted commercial speech. The crucial distinction between *Semco* and the facts here, however, is that the *Semco* article *on its face* amounted to a blatant—and rousing—endorsement of Amcast. Its unabashedly laudatory nature subsumed its

informational value, obviating the need for further probative discovery.

**5.** Our conclusions here relate solely to the use of this "new evidence" for purposes of reopening a substantive cause of action. Our determinations have no bearing on its admissibility in an evidentiary context. Indeed, as we observed at oral argument, this evidence seems highly relevant and probative to the issue of secondary use.

**6.** Furthermore, we did not conclude that the articles possessed no commercial element whatsoever, but rather that they were a composite of the informational and the commercial, with the former predominating. As the two are not mutually exclusive, but can—and do—coexist, any intention by Defendants of using the reprints for promotional ends does not preclude a finding of informational value in the articles themselves. It is a showing of commercial *orientation*, not commercial *motivation*, that triggers application of section 43(a).

effect to foreign judgments on the basis of comity. The law is unsettled, however, as to what exactly "comity" entails;[7] thus, it is primarily principles of fairness and reasonableness that should guide domestic courts in their preclusion determinations.

■ On the basis of such principles, we decline to give preclusive effect to the Swiss and German judgments. Although no single element is dispositive, the following six factors point against preclusion: (1) lack of reciprocity—neither Switzerland nor Germany recognizes the doctrine of collateral estoppel and thus would not recognize a judgment rendered by an American court;[8] (2) absence of identity of the parties—Harwood and STBS were not plaintiffs in the Swiss and German actions;[9] (3) civil law procedural differences;[10] (4) complications inherent in ascertaining foreign law;[11] (5) selective and inconsistent use of collateral estoppel;[12] and (6) existence of a conflicting French judgment.[13]

7. "[T]he rule of collateral estoppel, often difficult of application to domestic judgments ..., presents additional difficulties when sought to be applied to foreign judgments." *Bata v. Bata*, 163 A.2d 493, 505 (S.Ct.Del.1960), *cert. denied*, 366 U.S. 964, 81 S.Ct. 1926, 6 L.Ed.2d 1255 (1961).

8. The general rule of reciprocity was first articulated in *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), where the Supreme Court ruled that foreign judgments are entitled to the same respect in the United States as a United States judgment would receive in the courts of that foreign nation. *See also Bata*, 163 A.2d at 506 (noting that as civil law does not acknowledge collateral estoppel, Swiss judgment is not "entitled ... to binding effect" in American courts).

9. One of the principal requirements of the collateral-estoppel doctrine is that the parties against whom the doctrine is being applied had sufficient opportunity to litigate in the first action. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 639 (2d Cir.), *cert. denied sub nom. Rothenberg v. Amalgamated Sugar Co.*, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987). This requirement is constitutionally mandated; when parties currently before an American court were not parties to the foreign action, the Due Process Clause prohibits application of the rule of collateral estoppel against them. *First Nat'l Bank of Boston v. Chase Manhattan Bank, N.A.*, 1988 WL 80149, at *3 (S.D.N.Y. July 26, 1988). Although this "same-party rule" applies to parties or their privies, neither Harwood nor STBS is in privity with Gordon and Breach; mere commonality of interest does not suffice. *See* 18 C. Wright, A. Miller, E. Cooper, Federal Practice and Procedure § 4449, at 411–419 (1981). The relationship between plaintiffs is not so close as to qualify for "virtual representation," an expansive theory that cloaks the term "privity" with a quasi-class action status. *See id.* § 4457, at 494–502.

10. Plaintiffs maintain that civil law procedures, namely the reduced opportunity for discovery and the lesser evidentiary showing, are inadequate and thus make preclusion inappropriate. Although the caselaw surrounding this precise issue is sparse, one leading conflict-of-laws scholar has observed that with regard to civil law judgments, the rationale behind preclusion is weaker, due to substantial differences in the laws of procedure and evidence and in judicial training. In those instances where an American court faces a prior civil law judgment, "a second lawsuit would definitely not be a mere duplication of the prior foreign proceedings. Specifically, the full opportunity to litigate in the local proceedings will ordinarily be quite different from that offered in the foreign forum." Hans Smit, International Res Judicata and Collateral Estoppel in the United States, 9 UCLA L.Rev. 44, 62 (1962) (footnote omitted).

11. Considerations of expediency and efficiency, especially in light of the staggering cost that this litigation has already run and will continue to run, dictate our position on this point. *See* Smit, 9 UCLA L.Rev. at 71–72 (discussing judicial burdens in assessing whether pertinent issues had actually been litigated and decided).

12. The German and Swiss judgments found that the articles constituted promotional advertising, yet we did not consider those findings in our earlier ruling. We are disinclined to entertain a selective application of what is already an arguably murky and ambiguous rule.

13. We find it troublesome that the last word in France on the substance of the action led the lower court to a completely different conclusion than that reached by the German and Swiss tribunals. Although the lower court's determination as to the misleading nature of the surveys does not represent a final judgment for collateral-estoppel purposes, we find it even more problematic that the appellate court's ruling—which represents the final judgment in France—as to the applicable law is itself in conflict with the choice-of-law determinations made in the Swiss and German fora.

The traditional rule concerning conflicting judgments is that the most recent judgment governs (on the theory that the later court will have already considered the preclusive effect to be given the earlier ruling); however, some commentators maintain "that this [last-in-time] rule

## III. Secondary Uses

Defendants contend that plaintiffs' evidentiary showing is facially and legally insufficient to sustain a false-advertising action on secondary use. We disagree.

As discussed in fuller detail in our earlier decision, see Gordon and Breach, 859 F.Supp. at 1532–39, congressional intent regarding the meaning of "commercial advertising or promotion" under the Lanham Act is unclear. Supreme Court definitions of commercial speech [14] serve as the principal guideposts by which to steer a judicial course.

Although the exact scope of section 43(a) is ambiguous, the secondary uses here fit comfortably within any of the competing interpretations of that provision. While a content-based inquiry shaped our analysis of the articles themselves, it is a context-based approach that frames our determinations as to the secondary uses. Defendants' use of the surveys directly to target relevant consumers is precisely the type of promotional activity that the Lanham Act seeks to regulate. "[T]he commercial advertising element is meant to [grant] relief in those cases where the false advertising . . . reach[es] the people that matter most under the Lanham Act— the consumers." Mobius Management Sys., Inc. v. Fourth Dimension Software, 880 F.Supp. 1005, 1020 (S.D.N.Y.1994); see Board of Trustees of the State Univ. of New York v. Fox, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (presentation of houseware products to group of potential buyers is commercial act); Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (mailings directed at general purchasing public constitute commercial speech); Semco, 52 F.3d 108 (distribution of reprints of favorable article at tradeshows

and reference in pitch by salesmen constitute promotional advertising); American Needle & Novelty v. Drew Pearson Mktg., 820 F.Supp. 1072, 1077–78 (N.D.Ill.1993) (dissemination of marketing information to retailers at trade show comes within reach of Lanham Act); Birthright v. Birthright, Inc., 827 F.Supp. 1114, 1138 (D.N.J.1993) (Lanham Act applicable to fundraising letters). This element of consumer-orientation—of directly targeting relevant purchasers—pervades virtually all of defendants' secondary uses. We find it dispositive.

### A. Distribution of Preprints

■ The dissemination of preprints at the SLA convention in June 1988, Pls.' Ex. 23, specifically targeted the relevant purchasers of scientific journals. The distribution here is virtually identical to that of the defendants in Semco, where the Sixth Circuit found that "[e]ven if, as the district court held, the Lanham Act had not applied to the article itself as published, the Act certainly covers Amcast's use of the reprint as advertising at tradeshows." Semco, 52 F.3d at 111; see American Needle, 820 F.Supp. at 1077–78 (Lanham Act covers distribution of information to retailers at trade show). Our conclusions are the same.

### B. Presentations

Likewise, the presentations of the survey results by Lustig to physicists and librarians, see Pls.' Exs. 52, 53, constitute commercial advertising. The discussions centered around the Barschall articles and were addressed to consumers of defendants' journals. They plainly fall within section 43(a).

### C. SLA Conventions

■ The references made to the surveys at the 1987 and 1988 SLA conventions, however, escape the reach of the Lanham Act,

can be applied to foreign judgments only after it has been established that the law of the second foreign forum recognizes the res judicata effect of prior foreign judgments." Smit, 9 UCLA L.Rev. at 46 n. 13. In this instance, either an application of the last-in-time rule (with the French appellate decision representing the most recent of the conflicting choice-of-law rulings) or a refusal to extend the rule to conflicting civil law judgments (given the civil law's nonrecognition of collateral estoppel) points in the same direction. Both dictate a fresh look by an American court applying American law.

14. The basic definition of commercial speech is "speech which does 'no more than propose a commercial transaction.' " Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (quoting Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973)).

for differing reasons. As to the former, all claims relating to the June 10, 1987, convention are time-barred by the applicable statute of limitations.[15] Regarding the latter, at that convention it was the moderator, not the AIP representative, who focused on the Barschall studies. The mention of the articles was thus for informational, not promotional, purposes.

### D. *Mailings*

The specific facts behind the various mailings of promotional letters and reprints dictate an independent analysis of each mailing.

▮ We conclude that the materials sent in August and September 1988, Pls.' Exs. 21 and 22, fall outside the statute of limitations and thus that all related claims are time-barred.[16]

▮ The May 1988 promotional letters signed by Fitch, Pls.' Ex. 43, are commercial speech. Defendants make much of the fact that these letters were mailed to *members,* not librarians; they contend that as members pay reduced prices for the journals, they do not constitute relevant consumers and thus the letters cannot be considered promotional advertising. We disagree. AIP and APS members influence librarians. Librarians will consider the members' suggestions and recommendations as to which journal subscriptions to renew. Defendants themselves were plainly aware of—indeed, even sought to benefit from—this relationship. The letters explicitly urged the member-recipients to "[p]lease inform your librarians of these facts." *Id.* The situation before us is strikingly similar to that in *Williams Electronics, Inc. v. Bally Manufacturing Corp.,* 568 F.Supp. 1274 (N.D.Ill.1983), where the court ruled that the showing of an internal memo of the defendant manufacturer, concerning the products of the plaintiff competitor, to the manufacturer's *distributors*—themselves not the relevant consumers—constituted

false advertising. "Since the memo was shown to persons who would use it to influence purchasing decisions, it is covered by the Lanham Act." *Id.* at 1282 n. 24. APS and AIP members similarly could use the Barschall information "to influence purchasing decisions," and thus the letters sent to them with that information likewise come within section 43(a).

▮ The promotional letters sent abroad—to France, Pls.' Ex. 47, Japan, *see* Pls.' Exs. 19, 46, and the single letter to England, Pls.' Ex. 54—all fall within the Lanham Act. Defendants contend that the Lanham Act has no extraterritorial reach. The Court, however, interprets the relevant caselaw to hold that where (1) the acts in question significantly impact United States commerce; (2) the defendant is an American citizen; and (3) application of the Act would not interfere with the laws of a foreign nation, the Act can reach activity beyond United States borders. *See Warnaco, Inc. v. VF Corp.,* 844 F.Supp. 940, 950–52 (S.D.N.Y. 1994) (citing *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 641–42 (2d Cir.), *cert. denied* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956)); *see also Steele v. Bulova Watch Co., Inc.,* 344 U.S. 280, 286–289, 73 S.Ct. 252, 255–257, 97 L.Ed. 319 (1952) (emphasizing importance of not infringing on sovereignty of foreign state); *A.T. Cross v. Sunil Trading Corp.,* 467 F.Supp. 47, 50 (S.D.N.Y.1979) (concluding that legislative intent behind Lanham Act was for broad jurisdictional reach). Here, given (1) the mailing of the letters from New York City and the promotion of journals of American corporations; (2) the American citizenship of APS and AIP; and (3) the absence of any interference with foreign sovereignty, we find the extraterritorial application of the Lanham Act to be warranted. Moreover, as the letters were mailed in the United States, they constitute activity *within* American borders,

---

**15.** All claims arising from activities that date before September 23, 1987, are time-barred. *See supra* note 1.

**16.** Although the September cover letter contains no specific date, but instead reads simply "September 1987," both plaintiffs and defendants acknowledge that the letters were most probably

sent in early September—prior to the relevant September 23, 1987, cutoff. *See* Pls.' Ex. 4 at 16–17, 80–81 (December 20, 1994, deposition of Robert Marks); Defs.' Ex. 17 at 16–17, 80–81 (same); Defs.' Ex. 41 ¶¶ 4–5 (June 6, 1995, declaration of Linda M. Fitzgerald, PC Training Coordinator for AIP).

regardless of the address of the intended recipients. Application of the Act to these letters is thus plainly appropriate. *See Steele*, 344 U.S. at 286, 73 S.Ct. at 256 (rationale for applying Lanham Act is even stronger when acts are not "confined within the territorial limits of a foreign nation"); *A.T. Cross*, 467 F.Supp. at 50 (where acts took place both in United States and abroad, situation presents stronger "jurisdictional base under the Lanham Act").

 As regards the letter sent to the librarian in Oxford, England, defendants also contend that a single letter is insufficient to constitute advertising. We find, however, that breadth of dissemination, although important, is not dispositive. Rather, the primary focus is the degree to which the representations in question explicitly target relevant consumers. In *Mobius Management*, the court specifically held that a letter sent by a computer software manufacturer to a single customer could constitute "commercial advertising or promotion." *Mobius Management*, 880 F.Supp. at 1020. We concur with Judge Preska that *any* promotional statement directed at actual or potential purchasers falls within the reach of section 43(a).[17]

 Finally, as concerns the planned 1988 and 1989 mailings,[18] Pls.' Exs. 45, 60, letters and reprints never sent cannot sustain a false advertising claim and do not warrant injunctive relief. *See Vitale v. Marlborough Gallery*, No. 93 Civ. 6276 (PKL), 1994 WL 654494 at *6 (S.D.N.Y. July 5, 1994) (no section 43(a) liability based solely on allegations that defendants intended to disseminate misleading statements in the future).

### E. *Advertisements*

 Defendants' advertisements, Pls.' Ex. 56, do not make specific reference to the Barschall surveys. The language employed, "the most cost-effective prices" and "subscription prices as low as possible," is but general puffery, common to many advertisements. As they contain no factual state-

ments concerning the survey results, the advertisements do not fall within section 43(a), which requires a "false or misleading description . . . or representation *of fact*." Section 43(a); 15 U.S.C. § 1125(a) (emphasis added).

### CONCLUSION

For the reasons set forth above, we deny plaintiffs' motion and grant defendants motion in part and deny it in part. We grant only those aspects of defendants' motion for summary judgment that relate to the time-barred SLA convention and time-barred mailings; the SLA convention at which only the moderator spoke of the Barschall surveys; the mailings that were never sent; and the advertisments.

SO ORDERED.

---

17. *American Needle*, cited by defendants, is inapposite. There, the single letter found by the court to fall outside the Lanham Act was "addressed to a *nonconsuming* licensor." *American Needle*, 820 F.Supp. at 1078 (emphasis added).

18. With regard to the September 1988 mailing, *see supra* note 2 and text accompanying note.